Argued and submitted February 28, reversed May 2, 2007

In the Matter of
R. H.,
Alleged to be a Mentally Ill Person.
STATE OF OREGON,
*Respondent,*

*v.*

R. H.,
*Appellant.*

Multnomah County Circuit Court
050666663; A129323

157 P3d 1286

Lance D. Perdue filed the brief for appellant.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Elizabeth A. Gordon, Assistant Attorney General, filed the brief for respondent.

Before Haselton, Presiding Judge, and Armstrong and Rosenblum, Judges.

ROSENBLUM, J.

**ROSENBLUM, J.**

The trial court committed appellant to the custody of the Department of Human Services (DHS) after finding that, because of a mental disorder, he was dangerous to others. Appellant contends on appeal that the state failed to prove by clear and convincing evidence that he poses a danger to others. He also argues that the trial court erred in finding that he is unwilling or unable to participate in treatment on a voluntary basis. On *de novo* review, *State v. North*, 189 Or App 518, 520, 76 P3d 685 (2003), we conclude that there is insufficient evidence that appellant poses a danger to others, and we therefore reverse.

We consider the facts as they existed on July 1, 2005, the date of the commitment hearing. Appellant was 48 years old at the time. He concedes that he suffers from bipolar disorder and alcohol abuse. He had been hospitalized voluntarily at least 20 times since he was 17 years old. By his own admission, when he drinks alcohol, his behavior suffers dramatically.

The exact sequence of the events that led to the commitment hearing is not clear, but the record reflects the facts that follow. Approximately two weeks before the hearing, appellant began consuming alcohol. Before then, he had been sober for 16 months. Around the same time, he stopped taking medication prescribed for his bipolar disorder. Appellant began calling his mother, who suffers from Alzheimer's disease and moderate dementia, at the care facility where she lives. Appellant appeared to believe that his sister was trying to prevent him from seeing their mother in furtherance of a conspiracy to prevent him from receiving any inheritance when she dies. Appellant evidently believed that the administrator of the care facility and the police were involved in that conspiracy.

His mother became agitated as a result of the calls, so the staff at the care facility removed the telephone from her room. Appellant began calling the facility repeatedly and demanding to speak with his mother. Freeman, the administrator, testified that the facility does not have a receptionist and that whoever is available answers the telephone.

Freeman said that the first time she spoke with appellant on the telephone, he wanted to be transferred to the building that his mother was living in. Freeman said, "Please hold. I'll transfer you." Appellant hung up before she could transfer the call. Within seconds, appellant called again. When Freeman answered, appellant said, "That bitch put me on hold. Don't put me on hold again. I want to talk to my mother." Freeman testified that appellant called the facility about 50 times that day, sometimes identifying himself as someone else. She stated further that that was the first of three series of incessant calls that appellant made to the facility over the next two weeks.

On June 22, appellant was taken to the emergency room at Good Samaritan Hospital and put on a hospital hold after a neighbor called a mental health crisis hotline and reported that appellant was being aggressive. Appellant was released from the hold two days later. In the days after his release, appellant again called the care facility. One time when Freeman answered the phone, he told her, "Listen bitch, I know who you are. I know what you've done. You've cost me $20,000 by saying I harassed you by the phone. And I'm going to get you." Freeman testified that appellant made other phone calls that were "inappropriate and often irritating and scary." She eventually called the police and reported the calls.

At some point during these events, appellant took his mother from the care facility without notifying the facility's staff and without taking her medications along. He kept her out overnight; the record does not indicate where they stayed or how she returned to the facility. The next day, he came to the facility again and took her to the office of a doctor whom she apparently no longer was seeing. At the office, appellant asked for his mother's social security number. Appellant left his mother at the office after the doctor told him that the police had been called, that his sister was coming to take their mother home, and that appellant should leave. Appellant's sister came to the doctor's office and drove their mother back to the care facility. Nothing in the record indicates that she suffered any harm while she was with appellant. However, as a result of appellant's actions, the care facility began keeping the front door locked at night.

On June 28, appellant called his case manager and threatened to kill himself. She went to his apartment and called the police. The police took appellant into custody, and Officer Dewayne drove him to the hospital. On the way, appellant threatened to kill Dewayne and his family. Then, as they were walking to the emergency room, appellant referred to Dewayne as a "dead man walking."

At the hospital, appellant was put on another hold and was prescribed new medication, which he took. Thereafter, commitment proceedings were commenced. At the commitment hearing, appellant testified that his mother had asked him to take her to the doctor's office. He also testified that he did not believe that his mother had dementia. He stated that, in his view, she was "90 percent." Appellant's case manager also testified at the hearing. She stated that appellant seemed "clearer" and "seem[ed] to be doing better" than he had at the hospital three days earlier.

The trial court found that appellant was a danger to his mother, noting that he had been acting on "delusions regarding his mother, not just regarding money, but also regarding her treatment and what's best for her * * *." It also found that appellant was "unwilling, unable, or unlikely to participate in treatment on a voluntary basis * * *." The court committed appellant to DHS for up to 180 days. This appeal followed.

■ Appellant makes two assignments of error. In the first, he argues that the trial court's finding that he was a danger to his mother is not supported by clear and convincing evidence. He argues that there is no evidence that he has any history of violence and that his behavior was not part of a pattern of threatening conduct. According to appellant, his behavior was "the one-time result of a highly stressed person who wanted to see his mother and was being denied, acting without his proper medications, and being intoxicated after a period of 16 months of sobriety." The state responds that appellant committed prior dangerous acts that indicate future dangerousness when he "removed his mother from [the care facility] without her medications, subjected her to dangerous conditions, and then abandoned her." The state argues that appellant's behavior was so threatening that the

care facility increased security in response to it. In support of its assertion that appellant presented a danger to others, the state also relies on appellant's threats to Freeman and Dewayne.

■■ ORS 426.130(1) provides that a court may subject a person to involuntary commitment if the state shows, by clear and convincing evidence, that the person is mentally ill. *See State v. Shorett*, 194 Or App 587, 595, 95 P3d 1146 (2004) (" 'Clear and convincing evidence' is evidence of 'extraordinary persuasiveness,' such that the 'truth of the facts asserted is highly probable.' " (citations omitted)). ORS 426.005(1)(d) defines "mentally ill person," in part, as a person who, because of a mental disorder, is dangerous to others. If the state relies on a previous act to establish that a person poses a danger to others, it "must show that the act 'clearly forms the foundation for a prediction of future dangerousness.' " *State v. Lott*, 202 Or App 329, 335, 122 P3d 97 (2005), *rev den*, 340 Or 308 (2006) (quoting *State v. Lucas*, 31 Or App 947, 950, 571 P2d 1275 (1977)).

The evidence that the state relies on in this case, all of which pertains to appellant's previous acts, does not rise to that level. Although appellant took his mother from the care facility without notifying or receiving permission from the staff, there is no indication that she was ever in any danger. Nothing in the record supports the state's assertion that appellant "subjected her to dangerous conditions." Given that there is no evidence of what happened the night that she was away from the care facility, we can only speculate about the conditions that he subjected her to. The fact that he left her medication at the facility does not, without more, show that she was in any danger. There is no evidence that failure to take the medication threatened his mother's health or safety in any way. Moreover, there is no evidence that his mother actually missed a scheduled dose of her medication. We also reject the notion that she was in danger because appellant "abandoned" her at a doctor's office.

Appellant's threats to Freeman and Dewayne also do not provide a basis for predicting future dangerousness. We have previously held that verbal threats of violence do not satisfy the future dangerousness requirement if they are not

accompanied by any overt act to follow through with the threat or if they are not made under circumstances that make actual future violence highly likely. *State v. Beil*, 196 Or App 501, 506, 102 P3d 757 (2004). There is no evidence of any acts by appellant suggesting that he would follow through with his threats. *Cf. State v. Woolridge*, 101 Or App 390, 395, 790 P2d 1192, *adh'd to as modified on recons*, 102 Or App 559, 794 P2d 1258 (1990) (an isolated threat, unaccompanied by any overt act to follow up the threat, is insufficient to establish future dangerousness). Nor does any evidence of his general demeanor or other circumstances under which he made the threats suggest that he was highly likely to become violent. *Cf. State v. Pieretti*, 110 Or App 379, 383-84, 823 P2d 426 (1991), *rev den*, 313 Or 354 (1992) (graphic threats to kill, coupled with violent reactions to frustration, were sufficient to establish future dangerousness even in the absence of past violent acts toward others). Nothing in the record indicates that appellant actually intended to harm Freeman or Dewayne in any way. None of the actions that appellant took either with them or with his mother suggests that he intended to follow through with his threats.

In short, appellant's actions do not establish a foundation for a prediction that he would be a danger to his mother, or anyone else, in the future. Because the evidence is not clear and convincing, the trial court erred in finding that appellant presented a danger to others.

In light of that conclusion, we need not address appellant's second assignment of error, in which he challenges the trial court's finding that he was unwilling or unable to participate in treatment on a voluntary basis.

Reversed.