188 P.3d 395 (2008)
220 Or. App. 647
In the Matter of K.L., Alleged to be a Mentally Ill Person.
State of Oregon, Respondent,
v.
K.L., Appellant.
MC030008A, A129657.
Court of Appeals of Oregon.
Argued and Submitted November 15, 2007.
Decided June 25, 2008.
Janie M. Burcart argued the cause for appellant. On the brief was Victoria K. Moffet.
Stacie Fatka Beckerman, Assistant Attorney General, argued the cause for respondent. On the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Judy C. Lucas, Assistant Attorney General.
*396 Before HASELTON, Presiding Judge, and ARMSTRONG, Judge, and ROSENBLUM, Judge.
ARMSTRONG, J.
Appellant seeks reversal of an order committing her to the custody of the Department of Human Services, ORS 426.130(1)(b)(C), which was based on a finding that, because of a mental disorder, she was a danger to others, ORS 426.005(1)(d)(A). On de novo review, State v. O'Neill, 274 Or. 59, 61, 545 P.2d 97 (1976), we reverse.
Appellant, who was 53 years old at the time of the commitment hearing in August 2005, is schizophrenic and delusional. Although the record is unclear as to the extent of her physical capacities, appellant used a cane to walk and appeared at the hearing in a wheelchair. Several interactions between appellant and neighbors and police prompted the hearing.
One neighbor, J, testified to three interactions that he had had with appellant. First, eight months before the August hearing, appellant, who was driving by J, waved, slowed her car, and commented to him that his "children were very cute," and that "she would like to see their heads on her fence." J explained, however, that it was not unusual for appellant to slow down, wave, and "say[ ] things" to him or his family, and that he would tell his kids to not talk to her and that she was "having a bad day." Further, on that occasion, appellant drove off but passed them again a few minutes later and "everything seemed fine. She waved again."
Second, two months before the hearing, J's 11-year-old daughter was playing with a friend on a property near appellant's house at around 9:00 p.m. when appellant told the children, from her driveway, that it was too late for them to be out and to "come in and go to bed." According to J, the interaction "scared the heck out of" his daughter, who told appellant that she was not her mother and then went home. Although J said that he initially believed that appellant "was just irritated because [his daughter and her friend] were talking, and it was evening and [appellant] was trying to be quiet," appellant's comment about "coming in" and going to bed gave J the impression that appellant was attempting to get the girls to come into her house.
Third, on August 10, J's daughter and her friend ran to catch the family puppy near appellant's yard while appellant was outside. Appellant waved her cane at the girls and told them in an angry and agitated manner, "If that dog and you come up here again, I'm going to kill you." Although J's daughter returned home "in tears," the girls retrieved the dog without further incident.
Appellant's neighbors C and A also testified to several interactions that they had had with appellant regarding their four-year-old daughter, L. In late July before the hearing, appellant stopped while driving and asked C how her (that is, appellant's) granddaughter was doing. C replied, "Fine," and "didn't think much" of the question until several weeks later, when appellant again stopped while driving by the family and claimed that L was her granddaughter, that she was "going to get [L] back," and that they had "better watch out." When C and A explained to appellant that she was mistaken and asked her to leave, appellant became "agitated" and "very angry," "leaning out [of the car] window" and pointing her finger at the family. That interaction left A extremely frightened for L's safety and caused the family to "have completely changed [their] lives" to avoid future confrontations with appellant. Six days later, on August 10, appellant again stopped her car in front of the family's house, but did not say anything to the family.
Those interactions prompted J, C, and A to contact the police, who went to appellant's home on August 10. When police knocked and requested entry, appellant refused to open her door, telling the officers that they were vampires, that they were "terrorist militia," and that, "on authority of President George Bush, she did not have to answer her door." The police contacted mental health investigator Terry and explained the situation. They decided, based on the neighbors' concerns and appellant's behavior, to take appellant into custody. After some time passed and the officers watched appellant retreating into her residence with her cane *397 and a hammer, the police broke through the door to the residence. Appellant had barricaded the door with some furniture and appliances, blocked an interior kitchen door with a table, and barricaded herself in her bathroom. One officer created a "diversion" by breaking a bathroom window, allowing the other officers to kick in the bathroom door. There, they found appellant yelling, with her cane and a hammer raised in the air, and, as they later discovered, other potential weapons nearby, including two "very sharp" steak knives and two ten-pound dumbbells. The officers immediately immobilized appellant with a taser and, after handcuffing her, transported her to a hospital.
At appellant's commitment hearing, Terry testified and submitted a report recommending that appellant be civilly committed to a mental health facility, stating that, although appellant was not a danger to herself or unable to care for her basic needs, she was
"a clear threat to others, as indicated by threats to harm neighbor[s], including statements that indicate she believes a neighbor's child is her granddaughter, and she plans on taking her, her threats to kill other's pets, her statements that she wants to see her neighbor's children's heads on her fenceposts, and her threatening behavior when she yells and attempts to strike others with her cane. She also threatened the police with a hammer and this attack was severe enough that she was tasered."
(Emphasis added.)
Dr. Khaleeq testified that, after admission to the hospital, appellant had not engaged in any violent behavior, although she became angry and agitated when the doctor confronted her about her delusions. Khaleeq opined that appellant
"continues to have a very poor understanding about the need to take the medications to treat her mental illness. She thinks that there's nothing wrong with her, and she will not continue treatment once she is discharged, then we need to (inaudible) that she will start involving other people, then she will become threatening to others, without even knowing that she is doing it."
(Emphasis added.) When asked, Khaleeq said that she based her opinion that appellant presented a danger to others on
"the concerns the community has for her * * *. She's not going to continue her psychotropic medications, and her beliefs can actually continue to suffer."
(Emphasis added.)
Finally, mental health examiner Barnes submitted a report stating that appellant is dangerous to others. He wrote:
"[Appellant] does not believe she has any mental illness nor that she needs to take medications. It is apparent [that] she has been decompensating, and that without treatment her condition will deteriorate further. Her paranoid delusions regarding her neighbors, and recent threats regarding neighbor children, combined with her disorganized thinking, constitute a real danger to others, which is also supported by her assaultive behavior toward the police. If not treated the danger is most likely to increase."
(Emphasis added.)
Appellant testified at the hearing, where she was calm, reasonably responsive, and coherent, although rambling and tangential in her testimony. She stated that she was "not someone [who] would hurt these children" and denied the neighbors' characterization of the events and her statements. She further stated that, when the police arrived, she was not aware that she "was under any suspicion for anything that was illegal" and was frightened when they knocked on the window and later broke down the doors. As of the time of the hearing, appellant had been taking a tranquilizer for eight days, but had otherwise refused to take the medications recommended by her doctors. She denied that she was schizophrenic and maintained that the only thing for which she needed treatment was a knee injury that she had sustained when the police took her into custody.
The trial court determined that, because of a mental disorder, appellant was a danger to others, and it committed her to the custody of the Department of Human Services for up to 180 days. ORS 426.130. On *398 appeal, appellant does not challenge the trial court's conclusion that she has a mental disorder. Rather, she argues that the state did not produce clear and convincing evidence that, because of her mental disorder, she is dangerous to others.
The state bears the burden to prove by clear and convincing evidence that appellant had a mental disorder that made her dangerous to other people. ORS 426.130(1)(b). We reiterate here, as we often do in civil commitment cases, that the clear and convincing evidence standard is a rigorous one, requiring evidence that is of "extraordinary persuasiveness," making the fact in issue "highly probable." State v. Allen, 209 Or.App. 647, 652, 149 P.3d 289 (2006); State v. Hambleton, 202 Or.App. 526, 533-34, 123 P.3d 370 (2005). That standard is not "merely abstract or precatory. Rather [it is] the product of a fundamental recognition of `the priority of preserving personal liberties[.]'" Hambleton, 202 Or.App. at 534, 123 P.3d 370 (quoting State v. Lott, 202 Or.App. 329, 354, 122 P.3d 97 (2005), rev. den., 340 Or. 308, 132 P.3d 28 (2006) (Edmonds, P.J., dissenting)).
In light of that standard, a court assesses whether the evidence presented to it is sufficient to prove that "a person is a danger to others as a result of [her] `condition at the time of the hearing as understood in the context of [her] history.'" State v. Lawrence, 208 Or.App. 212, 216, 144 P.3d 967 (2006) (quoting State v. King, 177 Or.App. 373, 377, 34 P.3d 739 (2001)). Specific acts of violence are not required to establish dangerousness. Id.; see also State v. Bodell, 120 Or.App. 548, 550, 853 P.2d 841 (1993); State v. Pieretti, 110 Or.App. 379, 383, 823 P.2d 426 (1991), rev. den., 313 Or. 354, 833 P.2d 1283 (1992). Rather, past statements that threaten violence or harm can justify a finding that a person is dangerous to others so long as those statements, in context, clearly form the foundation for a prediction of future dangerousness. Lawrence, 208 Or.App. at 216, 144 P.3d 967; see also State v. D.R.K., 216 Or. App. 120, 122, 171 P.3d 998 (2007). To form that foundation, we require that evidence of threats be accompanied by evidence of an overt act directed toward fulfilling the threats, or evidence that those threats are made under circumstances making future harmful acts highly likely. D.R.K., 216 Or. App. at 122, 171 P.3d 998.
The state maintains that the evidence of (1) appellant's delusional beliefs, (2) her threats to her neighbors and their subsequent fearful responses to those threats, (3) her violent response to the police forcibly taking her into custody, and (4) her deteriorating mental condition, refusal to acknowledge that she suffers from a mental illness, and refusal to comply with treatment, taken as a whole, "clearly forms the foundation for a prediction of future dangerousness." Id. The state further points out that three experts  the mental health investigator, the court-appointed mental health examiner, and appellant's doctor  all agreed that appellant was dangerous to others, a consensus that the state argues the trial court weighed appropriately in making its determination.
There are several problems with the state's argument. First, the record contains no evidence of an overt act or "circumstances making future harmful acts highly likely" regarding the threats that appellant made to her neighbors and their children. Indeed, with respect to appellant's comments in January, about her desire to see J's children's heads on her fence and in late July about "her granddaughter," the record indicates that appellant's neighbors did not contemporaneously understand those comments as bona fide threats but, rather, as indications that appellant was having a "bad day" or as innocuous (or potentially innocuous) ramblings.
As for the comments that the neighbors ultimately interpreted to be less benign, such as when appellant told J's daughter to "come in" and go to bed, nothing in the record, beyond J's impression of the statement, suggests that appellant intended that statement to mean what J believed it to mean, much less that appellant intended to take steps toward abducting J's daughter. Further, as for the incident with the dog, where appellant yelled and "waved" her cane at the girls, nothing in the record indicates that appellant attempted to strike, or even that her movements *399 appeared to be designed to harm, the girls or the dog. Likewise, as for appellant's gestures accompanying her threats about L, there is no evidence that those gestures were anything more than the product of appellant's agitated state. Even if we were to take together, as context, the statements that appeared to arouse the most concern in the neighbors  that is, appellant's comments implying a desire to abduct neighborhood children  to be evidence of her potential propensity to act on those threats, the record still comes up short. There are no overt acts or circumstances accompanying the statements to indicate that appellant would probably follow through on them. In short, appellant's threats and demeanor, taken together, do not constitute circumstances making future violence or harm by appellant toward others highly likely.
Second, to the extent that the state relies on appellant's reaction to the police taking her into custody as evidence of an overt act or circumstance indicating likely future dangerousness, that reliance is misplaced. Appellant's reaction to the police entering her home to take her into custody does not provide an analogous, or contextually referable, "follow up" act to her earlier threats against her neighbors. The dynamic of the police entry was entirely distinct from appellant's earlier threats. The forcible entry into her home put appellant on the defensive; in fact, an officer said that he believed that appellant, by creating barricades and gathering weapons, had "a belief that she was defending herself." Her response to the police, although unreasonable, does not speak to her propensity to act on her threats to harm her neighbors. Nor does her reaction, to the police, as the only evidence in this record of appellant behaving violently, form the foundation for a prediction of future dangerousness. Cf. State v. Miller, 198 Or.App. 153, 159, 107 P.3d 683 (2005) (appellant's isolated resistance to police "appear[ed] to have been in response to an unusual and threatening situation" and could not, on its own, serve as a basis to predict a high probability of future dangerousness).
Third, the mental health experts' opinions that appellant is dangerous to others do not adequately support appellant's commitment. In determining dangerousness to others, a court may consider the opinions of mental health experts, along with evidence of a person's past acts and his or her demeanor at the commitment hearing. Lott, 202 Or.App. at 335, 122 P.3d 97. However, to support commitment, an examiner's conclusion must be supported by facts. Allen, 209 Or.App. at 653, 149 P.3d 289; State v. Whitman, 132 Or.App. 596, 599, 889 P.2d 372 (1995). Here, the examiners' conclusions that appellant is a danger to others appear to be based, in large part, on the threats that appellant made toward her neighbors and on appellant's lack of insight about her mental disorder, not any other evidence in the record that appellant, if left untreated, would likely follow through on those threats or otherwise commit harmful acts. At most, the opinions appear to be based on appellant's past threats, not on any indication that she has the propensity or wherewithal to act on them. Hence, those conclusions do not, without more, constitute clear and convincing evidence supporting a commitment on the ground that appellant's mental disorder causes her to be dangerous to others.
We appreciate that the tenor of and imagery evoked by appellant's threats are truly disturbing, particularly when directed toward a child or the child's parents. Further, we recognize that the state need not wait to take action until actual harm results from appellant's mental disorder. However, without clear and convincing evidence in this record of a likelihood that appellant's threats (or anything remotely like them) would come to fruition, they remain merely that  threats  and do not provide adequate support for appellant's commitment on a danger-to-others standard. Compare, e.g., State v. R.H., 212 Or.App. 479, 484-85, 157 P.3d 1286 (2007) (no danger to others where appellant threatened nursing home staff and police officer without any evidence of acts or intent by appellant to carry threats through), with Bodell, 120 Or.App. at 550, 853 P.2d 841 (danger to others established where threats to kill pregnant wife and infant child were accompanied by attempt to hit wife and invasion of acquaintance's home), and Pieretti, 110 Or.App. at 383-84, 823 P.2d 426 (danger *400 to others established where graphic death threats were accompanied by dramatic loss of control and violent behavior when faced with "everyday frustrations"). Accordingly, the trial court erred in finding that appellant's mental disorder causes her to be dangerous to others and in ordering her commitment.
Reversed.