211 P.3d 975 (2009)
229 Or. App. 487
In the Matter of B.P., Alleged to be a Mentally Ill Person.
STATE of Oregon, Respondent,
v.
B.P., Appellant.
0700008MC; A136316.
Court of Appeals of Oregon.
Argued and Submitted on February 11, 2009.
Decided July 8, 2009.
Michael A. Breiling, Portland, argued the cause and filed the brief for appellant.
Karla Ferrall, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.
Before LANDAU, Presiding Judge, and SCHUMAN, Judge, and ORTEGA, Judge.
SCHUMAN, J.
After finding that appellant B.P. had a mental disorder that rendered him dangerous to other persons, the trial court committed him to the Mental Health and Developmental Disability Services Division for a period not to exceed 180 days. B.P. appeals. Our review is de novo, State v. O'Neill, 274 Or. 59, 61, 545 P.2d 97 (1976), and our task is to determine whether clear and convincing evidence, ORS 426.130(1)(b)(C), supports the trial court's findings. We reverse.
*976 When he first came to the attention of mental health providers in this case, B.P. was homeless and had been working with a social service agency to find housing. When he failed in that endeavor, B.P. fell into such apparent despair that one of the agency's advocates, Stewart, became concerned. Although B.P. harbored delusions that law enforcement officers, mental health workers, and others were involved in a conspiracy to persecute him, Stewart convinced him to accompany her to the Mid-Columbia Center for Living for evaluation and treatment; he consented because Stewart assured him that she would stay with him during his interviews.
During his intake interview, after a brief conversation about his housing problems and his state of mind, the clinical supervisor, Richards, told Stewart that she needed to talk to B.P. alone. According to Stewart, Richards's posture toward B.P. was "more aggressive than was needed." Richards, for her part, thought that her attitude was necessary in order "to do things that I needed to do which was the mental status exam and also find out if he was dangerous to himself."
Richards began by again asking B.P. about his housing. Instead of responding, he began to describe his persecution by police and employees of the Northern Oregon Regional Correction Facilities (NORCOR)and by one NORCOR employee in particular, W. When B.P. told Richards that W had stuck a rod up his spine, Richards "felt compelled to ask him if he was dangerous to himself." Richards described what happened next:
"And I felt compelled to ask him if he was dangerous to himself; if he wanted to harm himself. Ordinarily I probably wouldn't have asked that question because of the mental status, but I felt compelled that that was the reason he came in. And he said that he was going to kill 500 people and then the police would kill him.
"Ordinarily when we get that information we want to know if it's specific or general, to assess dangerousness. At that point in time, part of the conversation was him telling me, for me, that (indiscernible) I didn't know. I think one actually (indiscernible) NORCOR, but the person I did recognize was [W]. And he told meI said, `Do you have any meansa weapon, a gun' is what he said he was going to do, and he gave me the name of somebody that he was going to get it from. * * * Now, I had no way of knowing * * * whether any of this was true information. * * * And then he proceeded to give me an address. I don't know if it's [W's] address or not because I don't know [W].
"At that point in time, I can't, as a mental health worker, let somebody leave my office that I think is dangerous to self or others. I did not feel threatened by [B.P.] in my office; I felt very comfortable with him. I didn't feel like he was going to harm me. But I was fairly sure that when he saw a[ ] uniform, particularly an officer, that he would become probably more than agitated."
Richards was correct in her prediction. She had an assistant call police, and, when three officers arrived and burst into the interview room, some sort of scuffle ensued, ending when B.P. was tackled by the officers, shocked three times with a Taser, and escorted to confinement at the Blue Mountain Recovery Center (Blue Mountain), a state-operated psychiatric hospital in Pendleton.
Two days later, B.P. was evaluated at Blue Mountain by a clinical social worker, Patterson. Having been briefed on B.P.'s statements to Richards regarding W, Patterson raised the subject. B.P. denied having made the statements. He did, however, tell Patterson that he had "thoughts of killing Bill Gates and the employees of ITT Technical Institute as he sees them as symbols of the computer and telephone industry and thereby involved in the conspiracy against him." Based on Richard's report of B.P.'s threats regarding W and on the strength of B.P.'s conspiracy delusions, Patterson concluded that B.P. was dangerous to others; he "appears to be at risk of carrying out his intention and should be taken seriously."
The commitment hearing, ORS 426.070, was set for the day after the evaluation. Before the hearing, B.P. was interviewed by Dr. Sekiya, a psychiatrist employed by Blue Mountain. She found B.P. to be agitated and irritable. After only seven minutes, as she *977 was attempting to explain to B.P. that the hearing was not a criminal proceeding, she believed him to be so aggressive, angry, and "explosive" that she concluded that he was "potentially threatening" and terminated the meeting. She also reported, however, that he had not harmed or threatened to harm anybody during his confinement, nor was there any reported incident of aggressive or dangerous behavior.
At the hearing itself, Stewart, Patterson, and Sekiya testified, relating the facts as set out above. The court and the court-appointed examiner also questioned B.P. In addition to the information regarding threats to Bill Gates, ITT employees, and W, the questioning and testimony also established that B.P. had no documented history of violence (although he did at one point refer vaguely to having been in fights "all over the United States"). After hearing the testimony and reviewing the reports, the court made the following observations:
"[T]he issue is whether there is clear and convincing evidence that [B.P.] is a danger to others. I will be the first to agree that the evidence on that is mixed. For example, I do not believe that Ms. Richards testified that she personally felt threatened by [B.P.] when they got together in her office.
"Mr. Patterson did not indicate that he felt personally threatened by [B.P.] when he entered as the investigator in this case. And most particularly Ms. Stewart did not indicate that she felt threatened by [B.P.] in a relationship of at least four months' duration which seems to have been a relationship of fairly regular contact and communication. So I'm not going to say the evidence is unmixed.
"On the other hand, we have this: We have Ms. Richards'[s] testimony which I have no reason to find other than credible that at the time she interviewed [B.P.] he made threats * * *.
"[B.P.] said that he would like to kill Bill Gates and ITT.
"* * * * *
"I think those can be taken as the sort of comments one might make without a great deal of mean thought or meaning. However, I am concerned-this is second-by what Dr. Sekiya had to say, that two hours before this hearing began when she interviewed [B.P.] in preparation for the hearing, he became sufficiently, in her words, agitated, and in her other words displaying * * * psychomotor agitation to the extent that she felt threatened and discontinued the interview.
"And finally, and most important, Ms. Richards testified, and I do not have any reason to question or doubt this testimonyI find it to be credible, that in her presence * * * [B.P.] made a specific threat towards this specific individual, claimed to know that individual's address; he claimed to have a plan to use a firearm, and to have access to a firearm. * * *
"* * * * *
"That's why I find that you are, at this point, a danger to others."
The court may order the commitment of a person if the court has found, on clear and convincing evidence, that the person has a mental disorder and, as a result of that disorder, is (among other things) dangerous to others, unwilling or unable to participate in treatment, and not qualified for conditional release. ORS 426.130(1)(b)(C). Whether a person may be committed is determined by his or her condition at the time of the hearing, with the person's history providing context. State v. Woolridge, 101 Or.App. 390, 394, 790 P.2d 1192, adh'd to as modified on recons., 102 Or.App. 559, 794 P.2d 1258 (1990). In this case, the parties agree that B.P. has a mental disorder, that he would not voluntarily participate in treatment, and that he did not qualify for conditional release. The only issue is whether there is clear and convincing evidence that, at the time of hearing, he was a danger to others.
Generally, threats of future violence do not establish clear and convincing evidence of danger to others unless they are accompanied by some overt act indicating intent to follow through on the threat, State v. R. H., 212 Or.App. 479, 484-85, 157 P.3d 1286 (2007); State v. Beil, 196 Or.App. 501, 506, 102 P.3d 757 (2004), or they are made under unusual circumstances that make actual *978 future violence highly likelythat is, the threats clearly form a foundation for predicting future dangerousness, State v. Pieretti, 110 Or.App. 379, 383, 823 P.2d 426 (1991), rev. den., 313 Or. 354, 833 P.2d 1283 (1992).
Although fact-matching can be imprecise and unreliable, in the present case our earlier opinions point decisively and consistently in one direction: toward a conclusion that the court's finding here is not supported by clear and convincing evidence. We have found, for example, that a threat to blow up the mayor of Portland's house did not provide sufficient evidence of dangerousness because the threat was purely verbal, unaccompanied by any evidence of actual intent to follow through. Woolridge, 101 Or.App. at 395, 790 P.2d 1192. In R. H., 212 Or.App. at 482-85, 157 P.3d 1286, we found that the allegedly mentally ill person did not pose a danger to others despite the fact that he had verbally threatened to kill his mother and the police officer who arrested him: "Nothing in the record indicates that [R.H.] actually intended to harm [his mother or the officer] in any way. None of the actions that appellant took * * * suggests that he intended to follow through with his threats." (Emphasis added.) In State v. D.R. K., 216 Or.App. 120, 122-23, 171 P.3d 998 (2007), the appellant was seen stabbing kitchen knives into the ground and then, later, she threatened to maim and kill her mother; we found that evidence insufficient to establish danger to others because there was no "evidence of any acts by [the] appellant suggesting that she would follow through with the threats." (Emphasis added.) The fact that the allegedly mentally ill person is agitated and aggressive is not sufficient evidence, even when that state of mind accompanies a death threat. State v. K. L., 220 Or.App. 647, 650, 656, 188 P.3d 395 (2008) (agitated, angry appellant tells child that "if that dog and you come up here again, I'm going to kill you"). Further, when an allegedly mentally ill person resists being taken into custody, that resistance, even if it is unreasonable, "does not speak to [the person's] propensity to act on her threats * * *. Nor does [that] reaction, to the police, as the only evidence in this record of appellant behaving violently, form the foundation for a prediction of future dangerousness." Id. at 655, 188 P.3d 395; accord State v. Miller, 198 Or.App. 153, 159, 107 P.3d 683 (2005).
The very few cases in which we have found dangerousness based on a threat without subsequent action are also illustrative. In Pieretti, 110 Or.App. at 383, 823 P.2d 426, we found that the appellant posed a threat to others despite no overt violent act because he made repeated and graphic threats to kill several people and also "acted violently when faced with everyday frustrations." And in State v. Lawrence, 208 Or.App. 212, 214-15, 217, 144 P.3d 967 (2006), the appellant was found to be dangerous because the death threat he made against his estranged wife repeated a similar threat he had made and started to follow through on in similar circumstances in the past.
Nothing in the present case distinguishes it from the typical case involving verbal threats. Except for vague references to past "fights" and an apparently physical response to being arrested by three police officers, B.P. has no history of violence. He made no threats to caregivers or others during his confinement. The only person who testified at his hearing who knew him outside of the institutional context, Stewart, felt comfortable in his presence, as did all of the examiners except Sekiya. Sekiya, for her part, was disturbed by B.P.'s level of agitation and verbal aggression; he did not advance on her or explicitly threaten her. The threat involving W was not spontaneously delivered; it was elicited by Richards, as was B.P.'s apparently passing and undeveloped reference to his access to a weapon. In short, although the officials who decided to hold B.P. for observation and evaluation had every reason to be concerned and properly decided, as Richards put it, to "err on the side of safety," that caution did not translate into the clear and convincing evidence of danger to others that was necessary to deprive B.P. of his liberty for up to six months.
Reversed.