*J.H. v. TidalHealth Peninsula Regional, Inc.*, No. 754, Sept. Term 2020. Opinion by Ripken, J.

**MENTAL HEALTH — ADMISSION OR COMMITMENT PROCEDURE — ERROR**

The ALJ must order the release of the proposed admittee when (1) a procedural error occurred, (2) the error is substantial, and (3) no other available remedy is consistent with due process and the protection of the individual's rights. The lack of a written application for admission was a procedural error, but the ALJ did not err in concluding that the error was not a substantial error warranting the proposed admittee's release.

**MENTAL HEALTH — ADMISSION OR COMMITMENT PROCEDURE — EVIDENCE**

An inpatient facility may not admit an individual involuntarily unless: (1) the individual has a mental disorder; (2) the individual needs inpatient care or treatment; (3) the individual presents a danger to the life or safety of the individual or of others; (4) the individual is unable or unwilling to be admitted voluntarily; and (5) there is no available, less restrictive form of intervention that is consistent with the welfare and safety of the individual.

**MENTAL HEALTH — ADMISSION OR COMMITMENT PROCEDURE — EVIDENCE**

The requirements for involuntary admission were met where the treating physician reached a provisional diagnosis of a mental disorder requiring inpatient treatment based on short-term care and available patient history. Evidence also showed that the patient suffered from delusions, had recently stopped taking medications, and made repeated threats of harm towards his family. A family member testified that the patient's threatening behaviors were escalating. According to the treating physician, the proposed admittee lacked insight into his illness and could not provide consent for his voluntary admission.

Circuit Court for Wicomico County
Case No. C-22-CV-19-000448

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 0754

September Term, 2020

_____

J.H.

v.

TIDALHEALTH PENINSULA REGIONAL,
INC.

_____

Leahy,
Ripken,
Wright, Jr., Alexander
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Ripken, J.

_____

Filed: November 18, 2021

 Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Peninsula Regional Medical Center ("the Hospital")[1] admitted J.H. for psychiatric treatment based on a petition for an emergency evaluation. After the hearing, an Office of Administrative Hearings ("OAH") Administrative Law Judge ("ALJ") ordered that J.H. be involuntarily admitted.[2] J.H. petitioned for judicial review in the Circuit Court for Wicomico County. The circuit court held a hearing and affirmed the ALJ's decision. For the following reasons, we shall affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

J.H. was admitted to the hospital upon a petition for emergency evaluation executed by Deputy Sheriff Howser. The petition recited a series of concerning statements attributed to J.H. The petition also stated that J.H. was not taking medication as prescribed, and that he had threatened to beat up his father. J.H. was examined by an attending psychiatrist, Dr. Murdock, who determined that J.H. met the criteria for involuntary admission. Two other physicians certified that J.H. was suffering from an unspecified psychotic disorder and delusional paranoid hallucinations. Both physicians also certified that J.H. wanted to leave

---

[1] Peninsula Regional Medical Center was renamed to TidalHealth Peninsula Regional, Inc. during the course of this litigation.

We refer to the appellant by his initials, per his motion to change the case caption and seal the record, to preserve his privacy. We note that appellant, J.H., in this appeal was not involved in *J.H. v. Prince George's Hospital Center*, 233 Md. App. 549 (2017), to which we often refer.

[2] The Department of Health delegated the role of the impartial hearing officer to OAH, which held the hearing at the inpatient facility. *See J.H. v. Prince George's Hosp. Ctr.*, 233 Md. App. at 580–81.

the hospital, that outpatient treatment could harm him, and that he could harm his family or himself, if untreated.

Four days after the Hospital admitted J.H. for emergency evaluation, the ALJ presided over a hearing to determine whether J.H. should be involuntarily admitted for continued inpatient treatment. A representative for the Hospital acknowledged the record did not contain a written application for J.H.'s involuntary admission and stated that he had not seen such an application. Dr. Murdock testified at that hearing as an expert in psychiatry. Dr. Murdock regularly evaluated J.H. during J.H.'s time at the hospital. Dr. Murdock said that during an initial interview with a social worker, J.H. expressed delusional thoughts "such as being Jesus, being 200 years old, [and] the notion that his parents and others were coming into his room every night and raping him." Dr. Murdock provisionally diagnosed J.H. with "psychotic disorder, most likely on the spectrum of schizophrenic disorders."

Dr. Murdock explained that J.H.'s history of polysubstance dependence and head injuries complicated the diagnosis. When J.H. entered the emergency room, his drug test was positive for marijuana. J.H.'s mother reported that J.H. often used synthetic marijuana. Dr. Murdock said that there was no standard test for detecting synthetic marijuana use. The doctor stated that synthetic marijuana can cause psychosis lasting for a week or longer and that synthetic marijuana can worsen psychotic symptoms in those predisposed to mental illness.

Based on J.H.'s paranoia and delusional thinking, Dr. Murdock believed that J.H. presented a danger to himself or others. Dr. Murdock further testified that when J.H.'s

2

mother visited J.H. at the hospital, the meeting was confrontational. J.H. claimed that she was an imposter. J.H.'s mother reported that J.H. threatened to kill his family when he left the hospital. J.H. denied making the threat.

J.H.'s mother also testified at the hearing. She explained that J.H. was diagnosed with bipolar disorder and had been self-medicating. She stated that, in the weeks before his hospital admission, J.H. had stopped taking his medication prescribed for bipolar disorder. She testified that J.H. had been banging on windows, making threats, and yelling. She said that J.H. has "been threatening my life, and my husband's life, and his brother's life, and wanted to take his little sister away with him."

J.H. testified at the hearing. He stated that his mother was lying to keep him locked up at the hospital. He denied threatening to kill people and stated he had no intention of harming himself or others. He maintained that the nightly assaults he described were ongoing and not a delusion. He explained that he had stopped taking medication for bipolar disorder because of side effects. He testified that if he was released, he would continue to see a psychiatrist and accept treatment.

The ALJ noted that the record did not contain an application to involuntarily admit J.H. The ALJ concluded that this procedural error did not require J.H.'s release. The ALJ found that J.H. met the requirements for involuntary admission and ordered that he be involuntarily admitted.

J.H. petitioned for judicial review. The circuit court affirmed the ALJ's order. J.H. timely appealed. We describe additional facts below as needed.

## ISSUES PRESENTED FOR REVIEW

J.H. presents two issues for our review:

I.      Did the ALJ err in finding that the lack of an application for [J.H.'s] involuntary admission was not a substantial procedural error requiring [J.H.'s] release?

II.     Did the ALJ err in finding that the Hospital proved the grounds for involuntary admission under Health-General Art[icle] § 10-632?

## STANDARD OF REVIEW

When an administrative agency's decision is before this Court, we review the agency's decision; we do not review the circuit court's decision. *In re J.C.N.*, 460 Md. 371, 386 (2018). Substantial evidence in the record must support the agency's factual findings. *J.H. v. Prince George's Hosp. Ctr.*, 233 Md. App. 549, 578 (2017). Substantial evidence exists when "the facts in the record allow reasoning minds to reach the same determination as the ALJ." *Id.* at 596. We review the ALJ's legal conclusions *de novo*. *Id.* at 581.

## DISCUSSION

### I.      THE LACK OF AN APPLICATION FOR J.H.'S INVOLUNTARY ADMISSION WAS NOT A SUBSTANTIAL ERROR IN THE PREADMISSION PROCESS.

The parties agree that an error occurred—the record lacks an application for J.H.'s involuntary admission and the Hospital's representative stated that he had not seen such an application—but they dispute whether the error was substantial. On appeal, J.H. identifies two reasons that the lack of an application was a substantial error requiring his release. First, J.H. argues that the application is a mandatory first step, without which the ALJ did not have authority to order admission. Second, J.H. argues that the application is necessary because it requires the applicant to disclose his or her identity and relationship to the

4

proposed admittee, which helps to ensure that the admission is not sought for an improper purpose. The Hospital argues that the ALJ correctly determined that the error was not substantial based on the evidence in the record including the emergency petition and two physician certificates. We first review the law concerning involuntary admission, and then address J.H.'s arguments in turn. As we shall explain, the ALJ's decision was legally correct and supported by substantial evidence.

### A.    The Procedures for Involuntary Admission

The Health General Article ("HG") details the procedures for emergency evaluation and involuntary admissions for treatment of mental health disorders. Md. Code, Health-General Article ("HG") §§ 10-613 to 630 (2019 Repl. Vol.). A peace officer may petition for the emergency evaluation of a person when the officer reasonably believes that person suffers from a mental health disorder and presents a danger to the life and safety of that person or of others. HG § 10-622. If the petition is properly executed pursuant to HG § 10-622(c)(1), an emergency facility must accept the person identified in the petition, and a physician must evaluate the person within six hours of arrival to determine if the person meets the requirements for involuntary admission. HG § 10-624(b). A person may only be involuntarily admitted if: (1) the person has a mental disorder, (2) the person needs inpatient care or treatment, (3) the person presents a danger to his or her life or safety or that of others, (4) the person is unable or unwilling to be admitted voluntarily, and (5) there is no available, less restrictive form of intervention consistent with the person's welfare and safety. HG § 10-617(a). If a person meets these criteria, "the examining physician shall take the steps needed for involuntary admission[.]" HG § 10-625. The steps are as follows.

5

The statute requires the completion of an application for involuntary admission, which may be submitted by anyone with a "legitimate interest in the welfare of" the proposed admittee. HG § 10-614(a); *see In re J.C.N.*, 460 Md. at 377, 381 (application signed and submitted by hospital discharge coordinator). The inpatient facility must provide an application form, which must be signed and dated and must state the relationship of the applicant to the person proposed to be admitted. HG § 10-615. The application must be accompanied by certificates from two mental health professionals who personally examined the person, including at least one physician, diagnosing a mental disorder. HG §§ 10-615, 10-616(a). Regulations promulgated by the Secretary of Health require that one of the certificates shall have an attached medical report explaining, among other things, why the proposed admittee needs inpatient care and why the proposed admittee presents a danger to the admittee's own life or safety or that of others. COMAR 10.21.01.04C(4)(c).[3]

The proposed admittee has a right to a hearing, "to determine whether . . . to be admitted to a facility . . . as an involuntary patient or released without being admitted[.]" *In re J.C.N.*, 460 Md. at 378 (second alteration in original) (quoting HG § 10-632(a)). Within twelve hours of the person's initial confinement, the facility must give the person notice of their status in the proposed admission process and notice of various rights including the right to counsel. HG §§ 10-631(a)–(b); COMAR 10.21.01.05; *see also* HG

---

[3] The certifying professional must also certify that he or she "(a) Has no financial interest, through ownership or compensation, in a proprietary inpatient facility, and admission to that proprietary inpatient facility is sought for the individual whose status is being certified"; and (b) he or she "[i]s not related, by blood or marriage, to the individual or to the applicant[.]" COMAR 10.21.01.04B(8).

6

§§ 10-701 to 714 (concerning the rights of mentally ill people in inpatient facilities). The hearing occurs before an ALJ and the proposed admittee must receive notice of the hearing. COMAR 10.21.01.06 (requiring that the notice provide, among other things, "[a] short statement explaining why the individual's involuntary admission is being sought" and the standards "that govern whether the individual shall be involuntarily admitted[]"); COMAR 10.21.01.08–.09; *see* HG § 10-632.

"[T]he hospital's non-compliance with a preadmission procedure does not automatically result in the release of the individual from the hospital." *J.H. v. Prince George's Hosp. Ctr.*, 233 Md. App. at 590. When a hospital does not comply with a preadmission procedure, an ALJ shall "[o]rder the release of the individual from the inpatient facility" if (1) an "error in the process occurred"; (2) the error "is substantial"; and (3) "[n]o other available remedy is consistent with due process and the protection of the individual's rights." COMAR 10.21.01.09G; *In re J.C.N.*, 460 Md. at 379. The patient must raise alleged violations of preadmission procedures with particularity. *J.H.*, 233 Md. App. at 593. Then, "the burden shifts to the hospital to establish, by a preponderance of the evidence," that it followed the appropriate procedure, that the violation was not substantial, or that some other remedy would be consistent with due process and the protection of the individual's rights. *Id.* at 590–91.

This Court previously addressed whether an error in the involuntary admission process was substantial in *J.H. v. Prince George's Hospital Center*. 233 Md. App. at 596–599. There, patient M.G. argued at her admission hearing that the hospital failed to follow the proper preadmission procedures. She alleged that the hospital kept her in the emergency

room for forty-one hours after her emergency evaluation, failed to introduce evidence that medical professionals certified her for admission, and failed to introduce evidence that she received notice of her admission status and hearing. *Id.* at 562. The hospital did not enter the emergency petition, petition for involuntary admission, or physician certificates into evidence. *Id.* at 561 n.5. The hospital called M.G.'s treating physician, who testified that M.G. may have stayed in the emergency room beyond the statutory thirty-hour limit but she began to receive psychiatric treatment there. *Id.* at 596–97. The treating physician "could not clearly state when the emergency physician gave M.G. notice of her admission status" but he testified that "two licensed physicians certified M.G." *Id.* at 597. The ALJ reasoned that the alleged errors were not substantial because neither the failure to transfer M.G. from the emergency room nor the failure of notice prejudiced M.G.'s challenge to her proposed admission. *Id.* at 565. We affirmed the ALJ's determination as legally correct and supported by the evidence. *Id.* at 597. In other words, an error is not substantial as long as it does not deprive the proposed admittee of the opportunity for a full and fair hearing.

## B. The ALJ Had Authority to Hear J.H.'s Challenge to His Involuntary Admission.

Contrary to J.H.'s first contention, the ALJ's authority to adjudicate J.H.'s challenge to his involuntary admission followed from J.H.'s status as a proposed involuntary admittee confined at an inpatient institution. Section 10-632(a) states that "[a]ny individual proposed for involuntary admission under Part III of this subtitle shall be afforded a hearing to determine whether the individual is to be admitted to a facility . . . as an involuntary patient or released . . . ." Here, J.H. was "an individual proposed for involuntary admission under

8

Part III," § 10-632(a), because after his emergency evaluation it was determined that he met the requirements for involuntary admission and was not released, two physicians certified that J.H. required involuntary inpatient treatment, J.H. received notice of his legal status, and he appeared at the hearing. *See In re J.C.N.*, 460 Md. at 393 (initial confinement occurs when an emergency evaluee is transferred to an inpatient institution that provides evaluation, care, or treatment for people with mental disorders); *J.H.*, 233 Md. App. at 582–83 (describing two pathways to involuntary admission). The lack of written application did not deprive the ALJ of authority to adjudicate J.H.'s challenge to his proposed involuntary admission.

J.H. compares the lack of written application in an involuntary admission to the absence of a charging document in a criminal prosecution or juvenile delinquency proceeding. *See Stickney v. State*, 124 Md. App. 642 (1999); *In re Areal B.*, 177 Md. App. 708 (2007). But a written application in an involuntary admission proceeding is not subject to the same due process requirements as a criminal charging document and does not play the same fundamental jurisdictional role. First, concerning due process, in criminal and juvenile proceedings, Article 21 of the Maryland Declaration of Rights and the Due Process Clause of the 14th Amendment require that an accused receive fair notice of the allegations brought against her. *In re Roneika S.*, 173 Md. App. 577, 587 (2007). "[E]very criminal charge must, first, characterize the crime; and, second, it must provide such description of the criminal act alleged to have been committed as will inform the accused of the specific conduct with which he is charged, thereby enabling him to defend against the accusation[.]" *Id.* at 591–92; *see also* Md. Rules 4-201(a), 4-202(a) (stating that an offense may be tried

only based on a charging document and requiring, among other things, that the charging document "contain a concise and definite statement of the essential facts of the offense with which the defendant is charged"). Second, concerning its jurisdictional function, a charging document must "sufficiently characterize" the crime as one within the court's common law or statutory jurisdiction to "invest[] the [] court with jurisdiction to try the offense." *Williams v. State*, 302 Md. 787, 793 (1985).

Involuntary admissions are not criminal proceedings subject to Article 21, but due process and the Secretary's regulations nonetheless require fair notice for the impartial hearing to which proposed admittees are entitled. *J.H.*, 233 Md. App. at 572–77 (reviewing the development of Maryland's involuntary admissions procedures). Regulations require that the proposed admittee receive "[a] short statement explaining why the individual's involuntary admission is being sought" and "[t]he standards . . . that govern whether the individual shall be involuntarily admitted." COMAR 10.21.01.06B(2)(c)–(d). These notices are separate from the written application, and they are triggered upon a person's initial confinement in an inpatient facility. COMAR 10.21.01.08A. J.H. did not allege deficiency in these notices before the ALJ or in his briefing before this Court. As noted above, every proposed admittee must be afforded a hearing. HG § 10-632. The ALJ's jurisdiction does not depend upon the offense charged. We cannot agree that the lack of a written application deprived the ALJ of authority to hold a hearing.

**C.**     **The Lack of Written Application Did Not Deprive J.H. of the Opportunity for a Full and Fair Hearing and Did Not Warrant J.H.'s Release.**

J.H.'s second contention regarding substantial error is also unavailing. J.H. argues that a written application is necessary because, in requiring that the applicant have a "legitimate interest" in the proposed admittee's welfare, HG § 10-614(a), and state their relationship to the proposed admittee, HG § 10-615(4), the contents of the application help ensure that admission is not sought for an improper purpose.

The process J.H. received was, in substance, that which is required under the Health-General Article and the controlling regulations, and his hearing included the opportunity to challenge the interests and motives of parties seeking his admission. J.H. was admitted for evaluation based upon a properly executed petition for emergency evaluation. An attending psychiatrist determined that J.H. met the requirements for involuntary admission. Two physicians certified that J.H. suffered from an unspecified psychotic disorder and delusional paranoid hallucinations that required inpatient treatment and that J.H did not want to stay in the hospital. J.H. appeared at the hearing with counsel to challenge his proposed admission. J.H.'s mother and treating physician testified. At the end of the hearing, referring to the emergency petition, certifications, and "other checks and balances," the ALJ ruled that the lack of a written application did not warrant J.H.'s release.

There is no indication in this case that the lack of a written application hindered J.H.'s ability to contest his admission or challenge the motives of the Hospital's witnesses. The testimony of J.H.'s mother provided detail and assurances far beyond the basic information required in the written application. J.H.'s mother directly explained why she

11

wanted her son to receive inpatient treatment. J.H. had the opportunity to cross-examine his mother about her statements or about the information she provided to Dr. Murdock. But he declined to cross-examine her. The ALJ found her credible. The other evidence suggested that at other stages J.H.'s case was advanced by parties with a legitimate interest in his welfare. In preparing the emergency petition, Deputy Howser indicated under penalty of perjury that he believed J.H. required inpatient treatment. *See* HG § 10-622(a) & (c)(2). Once Dr. Murdock determined that J.H. met the criteria for involuntary admission, he was statutorily required to take the steps needed for J.H.'s admission. HG § 10-625. Based on these facts, the ALJ's determination that the error did not warrant J.H.'s release was legally correct and supported by substantial evidence.[4] *See J.H.*, 233 Md. App. at 596–599.

## II. THE ALJ DID NOT ERR IN FINDING THAT THE HOSPITAL SUFFICIENTLY PROVED THE REQUIREMENTS FOR INVOLUNTARY ADMISSION.

J.H. argues that the Hospital did not prove by clear and convincing evidence any of the requirements for involuntary admission under HG § 10-632. As noted above, the ALJ must order the release of a person proposed for admission, unless a hospital establishes by clear and convincing evidence that:

(i) The individual has a mental disorder;

(ii) The individual needs in-patient care or treatment;

(iii) The individual presents a danger to the life or safety of the individual or of others;

(iv) The individual is unable or unwilling to be voluntarily admitted to the facility; [and]

---

[4] Nothing in this opinion suggests that the lack of a written application might not lead to reversible error on different facts.

12

(v) There is no available less restrictive form of intervention that is consistent with the welfare and safety of the individual[.]

HG § 10-632(e)(2).[5] "To be clear and convincing, [the] evidence should be 'clear' in the sense that it is certain, plain to the understanding, and unambiguous and 'convincing' in the sense that it is so reasonable and persuasive as to cause one to believe it." *Mathis v. Hargrove*, 166 Md. App. 286, 312 (2005). The ALJ did not err in finding that the Hospital proved the requirements for involuntary admission by clear and convincing evidence.

**A.**     **The Evidence Sufficiently Established That J.H. Had a Mental Disorder.**

J.H. first argues that the ALJ erred in finding by clear and convincing evidence that J.H. had a mental disorder because Dr. Murdock's diagnosis was provisional and J.H.'s use of synthetic marijuana may have caused or exacerbated his psychotic symptoms. Mental disorder means "behavioral or other symptoms" that indicate to a physician conducting an examination of a patient, "at least one mental disorder that is described in the version of the American Psychiatric Association's 'Diagnostic and Statistical Manual—Mental Disorders' that is current at the time of the examination." HG § 10-620(f)(1).

At the involuntary admission hearing, the ALJ accepted Dr. Murdock as an expert in psychiatry. Dr. Murdock testified that he provisionally diagnosed J.H. with "psychotic disorder, most likely on the spectrum of schizophrenic disorders." This diagnosis matched the diagnosis of "unspecified psychotic disorder [and] delusional paranoid hallucinations" that the Hospital's representative described in the medical certificates. Dr. Murdock's

---

[5]  An additional element, inapplicable here, must be met "[i]f the individual is 65 years old or older." HG § 10-632(e)(2)(vi).

13

diagnosis was based on his observations, J.H.'s documented history, and history provided by J.H.'s family members. For example, J.H.'s mother described symptoms occurring a year before the hearing date. Dr. Murdock explained that these symptoms were indicative of an ongoing chronic illness. The doctor said that "the primary target symptoms that we're seeing right now are disorganized behavior, what appears to be paranoid and grandiose delusions consistent with schizophrenia." Dr. Murdock recited examples of recent delusional behaviors and statements.

J.H.'s medical history also included a series of head injuries and polysubstance dependence, which, as Dr. Murdock explained, complicated the diagnosis. J.H. tested positive for marijuana when he entered the emergency room. The test could not determine whether the marijuana was synthetic or organic. According to J.H.'s mother, he had a history of using synthetic marijuana. Dr. Murdock said that use of both types of marijuana can cause psychosis and synthetic marijuana use can exacerbate symptoms in those predisposed to psychosis. He explained that a period of sustained abstinence from drug use is necessary to make a definitive diagnosis.[6] At the time of the involuntary admission hearing, J.H. had not been under observation for enough time for Dr. Murdock to reach a definitive diagnosis.

---

[6] Additionally, Dr. Murdock explained that a diagnosis of schizophreniform disorder typically requires "at least six months of . . . persistent psychotic behavior meeting [the] criteria . . ." But, he continued, "we do have people that we are fairly certain about the diagnosis if we have a reasonable history of ongoing symptoms that have persisted more than six months."

14

J.H. has not offered any authority to suggest that a provisional diagnosis may not constitute clear and convincing evidence of a mental disorder. On the contrary, Dr. Murdock's diagnosis accounted for the complicating factors that J.H. raises. The evidence is sufficient to support the ALJ's finding to a clear and convincing standard that J.H. suffered from a mental disorder. *See Mathis*, 166 Md. App. at 312.

**B.      The Evidence Sufficiently Established That J.H. Was a Danger to Himself or the Life or Safety of Others.**

J.H. next argues that there was insufficient evidence to find that he was a danger to himself or others, particularly because J.H. had never previously acted violently and the evidence did not show an "imminent and likely danger." The Hospital argues that based on the testimony of Dr. Murdock and J.H.'s mother, there was sufficient evidence for the ALJ to find that J.H. presented a danger to the life or safety of others.

J.H.'s mother testified as follows:

> . . . [J.H. has] been threatening my life and my husband's life and his brother's life and wanted to take his little sister away with him.
>
>      He's made accusations of other people doing things to him and other people doing bad behavior, and none of it's true. So we're scared for him, scared of him. Although he has never done anything violent, we were very afraid. It was just escalating to the point of we couldn't sleep at night. He's banging on our windows making threats.

Dr. Murdock testified that J.H.'s mother reported a direct threat made by J.H. that he would harm her once released from the hospital. When Dr. Murdock questioned J.H. about that threat, he denied it. J.H. also denied making that threat in his direct examination.[7]

---

[7] The ALJ found J.H. and his mother to be credible, but did not make an explicit finding as to whom he believed regarding this threat.

Dr. Murdock opined that, considering J.H.'s delusional behavior and threats, there is "a great probability that if not treated . . . these delusions will continue and that violence would ensue." The evidence showed that J.H.'s delusions involved a belief that he was being recurrently attacked and that his parents were involved. The paranoid delusions focused on his parents in other ways, including that his mother was an imposter and was dangerous.

> The ALJ found that although J.H. had improved during his hospital stay,

> there is that psychotic delusional factor that's out there. And so with that and with I can tell some legitimate anger on the part of [J.H.] regarding, you know, some of the stuff with his parents right now and all. What is concerning to everybody is that the delusion will take over, you know, and, you know, potentially cause him to act on some delusional thoughts. . . . And I find that it's clear and convincing evidence that at least until he gets a little bit more treatment, which doesn't sound like it's going to take very long, he can be considered to be a danger to others.

The evidence supported the ALJ's conclusion to a clear and convincing degree.

J.H.'s reliance on an Oregon case, *State v. B.P.*, 211 P.3d 975 (Or. Ct. App. 2009), is unpersuasive. During an interview with a mental health worker, B.P. said he was going to kill hundreds of people and that then police would kill him. *Id.* at 976. Further questioning from the mental health worker suggested that B.P. had a plan to acquire a weapon to harm an employee of a correctional facility. *Id.* At a psychiatric hospital two days later, B.P. denied making that threat. *Id.* B.P., however, admitted that he had thoughts of killing Bill Gates and the employees of ITT Technical Institute. *Id.* In another interview, a psychiatrist found B.P. so aggressive and angry that she found him "potentially-threatening" and terminated the interview. *Id.* at 976–77. The trial court found that B.P.

16

had a mental disorder that made him dangerous to others, and it committed him to the Mental Health and Developmental Disability Services Division for a period not to exceed six months. *Id.* at 975.

The Oregon Court of Appeals reversed the trial court, finding that the evidence was insufficient to prove that B.P. was dangerous. *Id.* at 978. The appellate court held that "[g]enerally, threats of future violence do not establish clear and convincing evidence of danger to others unless they are accompanied by some overt act indicating intent to follow through on the threat or they are made under unusual circumstances that make actual future violence highly likely—that is, the threats clearly form a foundation for predicting future dangerousness." *Id.* at 977–78 (citations omitted).

The requirement that threats of future violence be accompanied by overt acts is not found in Maryland law nor do we find the reasoning in *B.P.* to be persuasive. In this case, we are not deciding whether one-off threats could ever satisfy the standard for dangerousness in Maryland. Rather, here, there was evidence upon which the ALJ could find that J.H.'s recent threatening behavior "clearly form[ed] a foundation" for predicting his future dangerousness. J.H.'s mother testified about repeated threatening behavior directed towards J.H.'s family members. She testified that his family, familiar with him outside of an institutional context, were "very afraid" and that J.H.'s behavior had become "more erratic and threatening." J.H.'s behavior escalated to the point that his parents could not sleep at night. The ALJ's decision is supported by the evidence, and the Hospital was not required to present evidence that J.H. committed an overt act.

**C.** **The Evidence Sufficiently Established That J.H. Could Not Be Voluntarily Admitted to the Hospital.**

J.H. argues that the ALJ erred in finding that J.H. was unable to voluntarily admit himself because insight into one's illness is not a legal prerequisite for voluntary admission and J.H. never testified that he was unwilling to pursue voluntary admission.

Dr. Murdock testified that J.H. lacked the capacity to make an informed decision about voluntary admission. The doctor testified that he spoke with J.H. about J.H.'s admission status:

> We've discussed the patient's legal status with him on multiple occasions. He was under the impression that he was already voluntary and did not want to sign anything additional. In my conversation with him, I felt that he did not have capacity to make an informed decision regarding a legal status because of his lack of understanding and his disorganized behavior. So, in addition to him not wanting to sign a voluntary admission, he demonstrated the lack of capacity to understand and to make that decision.

Dr. Murdock described the first criteria in determining whether an individual can give informed consent to treatment: an individual must possess "a rational and factual understanding of their diagnosis and what they're actually being treated for." Although Dr. Murdock stated that J.H. could weigh the risks and benefits of taking antipsychotic medications, Dr. Murdock concluded that J.H. failed the first criteria in determining whether an individual can give informed consent to treatment. That conclusion was based on several observations: J.H. believed that he was already voluntarily admitted; J.H. exhibited disorganized behavior; and J.H. denied having a mental illness. For these reasons, Dr. Murdock determined that J.H. could not make an informed decision about voluntary admission.

18

J.H. argues that Dr. Murdock's determination did not meet the legal standard governing voluntary admissions. Under HG § 10-609, individuals who are sixteen years or older may apply for voluntary admission to a facility. That statute provides, in pertinent part, that a facility may not admit the individual voluntarily unless the individual understands the nature of the request for admission. HG § 10-609(c)(3). Dr. Murdock's observations showed that J.H. could not understand the nature of a request for admission. The evidence was sufficient to prove by clear and convincing evidence that J.H. could not be voluntarily admitted.[8]

### D. The Evidence Sufficiently Established That J.H. Needed Inpatient Treatment and No Less Restrictive Form of Intervention Was Available Consistent with His Welfare and Safety.

J.H. last contends that outpatient treatment was a suitable and less restrictive form of intervention. He argues that Dr. Murdock did not state whether he considered alternatives.

Dr. Murdock concluded that J.H. needed institutional care or treatment. This conclusion was based on several of J.H.'s behaviors: delusional comments, confrontational visits with his mother at the hospital, statements to staff that his mother was an imposter, and repeated threats to his family.

---

[8] Other evidence indicated that J.H. was unwilling to be admitted, even if he were able to be voluntarily admitted. For example, he was asked on direct examination whether he would be willing to seek treatment and take medications if released. J.H. responded that he could agree to seeing someone "a couple of days a week." But he did not want to be "locked up again in rehab" and did not want "to be sent back into a treatment facility." He previously testified that his mother had gotten him "locked up in a hospital" "a couple of times" before.

Dr. Murdock testified that, at the time of the hearing, there was no less restrictive alternative to inpatient treatment available for J.H. The treatment plan included titrating J.H.'s antipsychotic medication to stabilize him and then introducing a "long-acting injectable antipsychotic which would hopefully prevent him from having to come back to the hospital at some point." Dr. Murdock explained the conditions and relative timeframe of J.H.'s release from hospitalization:

> From my standpoint, if we continue to see cooperation and compliance with medications, if these delusions resolve and if there is appropriate behavior in which there are no threats made to the mother and they seem to be getting along and he's . . . amenable to outpatient treatment, then I think his hospitalization would be relatively short.

The intent of the treatment was "to restore the patient to capacity to alleviate these delusions and allow him to live in the community where he can get on with his life." Based on Dr. Murdock's testimony, reasoning minds could find by clear and convincing evidence that J.H. needed inpatient treatment and that no less restrictive form of intervention was available consistent with J.H.'s welfare and safety.

**JUDGMENT OF THE CIRCUIT COURT FOR WICOMICO COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

20