*In re: J.C.N.*, No. 73, September Term, 2017

**MENTAL HEALTH LAW — INVOLUNTARY ADMISSION — PROCEDURAL REQUIREMENTS — TIMELINESS OF A HEARING —** The ten-day deadline for an involuntary admission hearing under Maryland Code, Health-General Article § 10-632(b) begins upon an individual's admission to an inpatient facility for mental health treatment. Thus, where an emergency evaluee was brought to a hospital's emergency department fourteen days before her involuntary admission hearing but ultimately transferred to the psychiatric unit of that hospital seven days before the hearing, the hearing was timely.

**MENTAL HEALTH LAW — INVOLUNTARY ADMISSION — INVOLUNTARY ADMISSION HEARING — ELEMENTS OF INVOLUNTARY ADMISSION — DANGER TO LIFE OR SAFETY OF SELF OR OF OTHERS —** Substantial evidence was produced at the involuntary admission hearing to support the administrative law judge's decision in favor of involuntary admission. One of the required findings for involuntary admission under Maryland Code, Health-General Article § 10-632(e) is that the individual presents a danger to the life or safety of the individual or others. In the present case, the evidence supported the administrative law judge's decision finding, by clear and convincing evidence, that J.C.N. was such a danger. J.C.N. refused to comply with medical or psychiatric treatment, lacked insight into her diagnosis, and was under the impression that she was able to drive a car, which would have been unsafe given her physical limitations.

Circuit Court for Anne Arundel County
Case No. C-02-CV-15-003887
Argued: April 10, 2018

IN THE COURT OF APPEALS

OF MARYLAND

No. 73

September Term, 2017

_____

In Re: J.C.N.

_____

Barbera, C.J.,
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Opinion by Barbera, C.J.

_____

Filed: July 31, 2018

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Bessie Decker, Clerk
April 20, 2018

We are presented here with a second opportunity in a span of several weeks to address the operation of the involuntary admission provisions of the Maryland Mental Health Law, found within Subtitle 6 of Title 10 of the Health-General Article, §§ 10-601–633. We begin by repeating the opening lines of the first of our opinions:

> Civil commitment of an individual to a mental institution against the individual's will may be sought when it appears necessary for treatment of the individual's mental disorder and for the safety of that individual or others. However, a decision on involuntary admission must take account not only of health and safety concerns, but also of the individual's right to liberty under the State and federal constitutions.

*Bell v. Chance*, No. 36, 2018 WL 3409919, at *1 (Md. July 12, 2018). The competing concerns addressed above—the individual's liberty interest and society's concern for the health and safety of the individual and others—lay at the center of the case before us.

Petitioner in the present case is J.C.N., who challenges her involuntary admission to the psychiatric unit of the University of Maryland Baltimore Washington Medical Center in December 2015. Respondents are the Baltimore Washington Medical Center and the Maryland Department of Health. J.C.N.'s involuntary admission was pursuant to the decision of an administrative law judge who, following a hearing, determined that she met the requirements for involuntary admission, including that she was at that time a danger to the life or safety of herself or others.

J.C.N., represented by counsel then and throughout judicial review of the administrative law judge's decision, argues that there were errors of procedure and substantive law on the part of Respondents and the administrative law judge. On judicial review in the Circuit Court for Anne Arundel County and on appeal to the Court of Special

Appeals, both courts determined that there was no error. For reasons that follow, we likewise find no error.

## I.

## The Statutory and Regulatory Scheme

Resolution of the parties' dispute turns largely on the proper interpretation and application of the Health-General Article ("HG") of the Maryland Code, Title 10, Subtitle 6, in particular the provisions found in Parts III ("Involuntary Admissions") and IV ("Emergency Evaluations"). We outline the pertinent statutory and regulatory provisions here.

*The Petition for Involuntary Admission*

An involuntary admission may be initiated by application. HG §§ 10-614 (permitting an application for involuntary admission to be made "by any person who has a legitimate interest in the welfare of the individual"), 10-615 (listing the requirements of an application). The process also may be initiated by a petition for emergency evaluation.

J.C.N. was admitted under the procedures governing petitions for emergency evaluations. Those procedures are found in Part IV of Subtitle 6, HG §§ 10-620–630, and associated regulations adopted by the Secretary of Health.[1] Peace officers and other

---

[1] The General Assembly has directed the Secretary of Health to "adopt rules and regulations to carry out the provisions of law that are within the jurisdiction of the Secretary," HG § 2-104(b), and to "carry out the provisions of" Title 10 of the Health-General Article, HG § 7.5-205(d). Pursuant to that statutory directive, the Secretary has adopted procedural regulations for involuntary admission hearings. HG §10-632(d)(1); COMAR 10.21.01.09.

2

enumerated professionals may make a "petition for emergency evaluation" of an individual. HG § 10-622(b). The petition may be made if the petitioner[2] believes that the individual has a mental disorder and "presents a danger to the life or safety of the individual or of others." HG § 10-622(a). Once lawfully executed, the petition is presented to a peace officer,[3] who is authorized to transport the individual against his or her will "to the nearest emergency facility." HG § 10-624(a). "If the petition is executed properly, the emergency facility shall accept the emergency evaluee." HG § 10-624(b)(1). An "emergency facility" is one that the Department of Health ("Department") "designates, in writing, as an emergency facility," and "includes a licensed general hospital that has an emergency room." HG § 10-620(d).

Within six hours of the individual's arrival at the emergency facility, "a physician shall examine the emergency evaluee, to determine whether the emergency evaluee meets the requirements for involuntary admission." HG § 10-624(b)(2). If the evaluee does not meet the requirements for involuntary admission, the emergency facility "shall" release the individual unless the individual requests voluntary admission. HG § 10-624(b)(3). "An

---

[2] If the petitioner is not one of the statutorily enumerated professionals, "the petitioner shall present the petition [for an emergency evaluation] to the court for immediate review." HG § 10-623(a). In that situation, the individual may be transported to an emergency facility for an emergency evaluation only after a court determines there is probable cause that the individual "has shown the symptoms of a mental disorder and that the individual presents a danger to the life or safety of the individual or of others." HG § 10-623(b).

[3] "'Peace officer' means a sheriff, a deputy sheriff, a State police officer, a county police officer, a municipal or other local police officer, or a Secret Service agent who is a sworn special agent of the United States Secret Service or Department of Homeland Security authorized to exercise powers delegated under 18 U.S.C. § 3056." HG § 10-620.

3

emergency evaluee may not be kept at an emergency facility for more than 30 hours." HG § 10-624(b)(4).

*The Start of the Involuntary Admission Process*

If it is determined that the emergency evaluee meets the requirements for involuntary admission, the examining physician at the emergency facility "shall take the steps needed for involuntary admission of the emergency evaluee to an appropriate facility, which may be a general hospital with a licensed inpatient psychiatric unit." HG § 10-625(a); *see* HG § 10-101(g)(1) (defining "facility," "[e]xcept as otherwise provided in this title," to mean "any public or private clinic, hospital, or other institution that provides or purports to provide treatment or other services for individuals who have mental disorders"). An "inpatient facility" is defined in the regulations, much as it is in the statute, as "an inpatient institution that provides evaluation, care, or treatment for individuals who have mental disorders." COMAR 10.21.01.02B(11)(a). An application to initiate the process for involuntary admission must be in writing and accompanied by the certificates of two physicians (or other statutorily enumerated health care providers) who have examined the individual and believe that the individual has a mental disorder; the individual requires inpatient care; and "admission to a facility . . . is needed for the protection of the individual or another." HG §§ 10-615–616.

Once confined initially in an appropriate inpatient facility, the individual remains in "observation status" pending a hearing to determine whether the individual should be admitted involuntarily. COMAR 10.21.01.07F(3).

*Notice and the Involuntary Admission Hearing*

Within twelve hours after the individual's "initial confinement," the facility must present to the individual a standard form providing notice of admission and advising of various rights, including the right to consult with a lawyer. HG § 10-631(a), (b). The notice includes the date of the individual's scheduled involuntary admission hearing, COMAR 10.21.01.05–.06, "to determine whether the individual is to be admitted to a facility . . . as an involuntary patient or released without being admitted," HG § 10-632(a).

The procedures attendant to the involuntary admission hearing are spelled out in HG § 10-632 and COMAR 10.21.01.09. The hearing "shall be conducted" by an administrative law judge ("ALJ")[4] "within 10 days of the date of the initial confinement of the individual." HG § 10-632(b). This requirement is repeated in the regulations: "When an individual is confined on observation status in an inpatient facility on the basis of application and certificates for [involuntary admission], inpatient facility staff shall: (a) Schedule a hearing to take place within 10 days of the individual's initial confinement in the inpatient facility[.]" COMAR 10.21.01.08A(1). Unless the ALJ for good cause orders otherwise, "the hearing shall take place in the inpatient facility where the individual is confined." COMAR 10.21.01.09B.

At the hearing, the ALJ shall:

---

[4] *Bell v. Chance*, No. 36, 2018 WL 3409919, at *3 (Md. July 12, 2018) ("The Secretary of Health has designated the administrative law judges ('ALJs') of the Office of Administrative Hearings to serve as the impartial hearing officers contemplated by the statute. COMAR 10.21.01.02B(2)."); *see also* Md. Code, State Gov't §§ 9-1601, -1605 (authorizing administrative law judges to conduct hearings).

(1) Consider all the evidence and testimony of record; and

(2) Order the release of the individual from the facility unless the record demonstrates by clear and convincing evidence that at the time of the hearing each of the following elements exist as to the individual whose involuntary admission is sought:

(i) The individual has a mental disorder;

(ii) The individual needs in-patient care or treatment;

(iii) The individual presents a danger to the life or safety of the individual or of others;

(iv) The individual is unable or unwilling to be voluntarily admitted to the facility; [and]

(v) There is no available less restrictive form of intervention that is consistent with the welfare and safety of the individual[.]

HG § 10-632(e).[5] The regulations add that the ALJ shall "[o]rder the release of the individual from the inpatient facility" if there was an "error in the process"; the error "is substantial"; and "[n]o other available remedy is consistent with due process and the protection of the individual's rights." COMAR 10.21.01.09G(3).

## II.

## The Present Case

*Factual Background*

In the summer of 2015, J.C.N. suffered a stroke and "thyroid storm"—a rare medical condition stemming from an overactive thyroid. Her brain swelled, she suffered partial

---

[5] There is one additional element that is inapplicable in this case because it applies only "[i]f the individual is 65 years old or older." HG § 10-632(e)(2)(vi).

paralysis on the right side of her body,[6] and she experienced partial loss of sight in her right eye. Her treatment included prescription steroids.

Four months later, J.C.N. began exhibiting symptoms of steroid-induced psychosis, a serious mental illness characterized by defective or lost contact with reality and often accompanied by hallucinations or delusions. A clinical social worker[7] filed a petition for emergency evaluation of J.C.N., and, on November 17, 2015, the Anne Arundel County Police Department transported her to the emergency department of the University of Maryland Baltimore Washington Medical Center ("Hospital"). Once in the emergency department, J.C.N. was determined not to be "medically stable" and was transferred that same day to a medical unit of the Hospital. There, she was observed and treated to address what was at that time her hypothyroid state, as is typically done with patients who present with steroid-induced psychosis.

J.C.N. was evaluated by an endocrinologist and neurologist to evaluate possible somatic complications deriving from her then-recent stroke and thyroid storm and to address her hypothyroid condition. Two endocrinologists recommended that J.C.N. take a thyroid medication, Methamizole. She initially complied but, when a few days later her thyroid levels returned to normal, she refused to take the medication notwithstanding her

---

[6] The ALJ noted the fact that, upon swearing in, J.C.N. was unable to raise her right hand.

[7] "Clinical social worker" is among those professionals listed in HG § 10-622(b) who are authorized to make an emergency petition. For purposes of the involuntary admission process, "'[c]linical social worker' means an individual who is licensed under Title 19 of the Health Occupations Article to practice clinical social work." HG § 10-601(b).

7

physicians' recommendation that she continue it to ensure stability.

On November 19, 2015, Doctors Sandeep Sidana, a board-certified psychiatrist, and Anisha Bassi, also a physician, evaluated J.C.N. and diagnosed her with bipolar disorder. Both doctors signed certificates stating that J.C.N. met the criteria for involuntary admission. They stated that J.C.N. suffered from "Bipolar 1 Disorder recent episode manic, severe with psychotic symptoms, with a differential diagnosis of steroid-induced psychosis or substance-induced mood disorder with manic features," and they noted her refusal to take the psychiatric medications prescribed to stabilize her manic episode. Dr. Sidana further noted that it was necessary for J.C.N. to remain in the medical unit at that time because there was "no safe alternative for her in that she wasn't medically stable or clear—so she wasn't able to be transferred to any other psychiatric unit including ours— she was kept on the medical floor while we stabilized her medically."

While J.C.N. was in the Hospital's medical unit, her family attempted to have her admitted to either Johns Hopkins Hospital or Sheppard Pratt Hospital for inpatient mental health treatment. For different reasons, both hospitals declined to accept J.C.N.: Johns Hopkins did not have an available bed, and Sheppard Pratt denied J.C.N. admission because, at the time of the family's request, she was receiving medical treatment to address the somatic effects of her steroid-induced psychosis.

On November 20, 2015, the Hospital's discharge coordinator signed an application for J.C.N.'s involuntary admission to the psychiatric unit of the Hospital. A psychiatric bed became available at the Hospital on November 24. J.C.N., who was by then medically stable, was transferred that same day to the psychiatric unit for proposed involuntary

8

admission.

*The Involuntary Admission Hearing*

J.C.N.'s involuntary admission hearing was held at the Hospital on December 1, 2015, before an ALJ. J.C.N. attended and was represented by counsel. J.C.N. and Dr. Sidana, who had signed one of the November 19 diagnoses and certificates, testified at the hearing. Ms. Diane Bolger, a psychiatric social worker, testified and conducted questioning on behalf of the Hospital. Ms. Bolger began with a brief statement of facts, including the relevant dates.

Dr. Sidana, a stipulated and accepted expert in psychiatry, testified that J.C.N. suffers from "Bipolar 1 Disorder recent episode manic, severe with psychotic symptoms, with a differential diagnosis of steroid-induced psychosis or substance-induced mood disorder with manic features." He testified that J.C.N., currently in a Ph.D. program, had "grandiose delusions and psychosis about her accomplishments," finances, and abilities. He stated that, influenced by those delusions, J.C.N. had tried to make unrealistic "plans to give these grand talks at various prestigious institutions" in the United States and abroad, for which she believed she would receive monetary compensation. Dr. Sidana further testified that J.C.N. fired her academic advisor because he did not support her efforts to arrange the talks; she attempted to have her academic committee write letters recommending her for research positions for which she was "clearly unqualified"; she had delusions that she personally knew President Obama and "[v]arious other high-esteemed figures"; and she had attempted to place phone calls to U.S. Senators and the White House.

Based on what he had learned from a letter written by J.C.N.'s parents, Dr. Sidana

9

reported that J.C.N. had attempted to make purchases beyond her means, including an automobile valued at $55,000. He explained that, notwithstanding her belief to the contrary, J.C.N. could not safely drive an automobile given the limited use of her right arm and hand, right "foot drop," and partial loss of sight in her right eye resulting from her recent stroke. J.C.N.'s attempt to purchase the car was thwarted by her parents, as they described in the letter. J.C.N. also had "contacted a company" that would provide chauffeur service, which she believed would cost twenty dollars per month.

Dr. Sidana also testified about J.C.N.'s lack of awareness of her mental and physical health:

> [J.C.N.] has shown very little insight or, actually, has shown no insight into her diagnosis, does not believe at all that she is manic, and therefore, has refused to take her psychiatric medications . . . [and] thyroid medications that were prescribed to her. . . .
> She was admitted first to the medical floor because she had a stroke around July and she also had a thyroid storm. So, that's a serious thyroid condition in which thyroid hormones skyrocket, and that can actually be very detrimental to her medical health.
> * * *
> [M]y concern for her would be . . . she is already demonstrating to me that she is having impaired judgment in managing her thyroid state . . . .

Dr. Sidana confirmed that J.C.N. had been refusing medications. He was then asked by Ms. Bolger, "[h]as she behaved in an unsafe way *other than that* since coming to the hospital?" (Emphasis added). Dr. Sidana answered, "No, she has not been unsafe other than that."

Dr. Sidana opined that given her history, J.C.N., if released, would not take her prescribed medications and would not comply with follow-up psychiatric care. He further opined that J.C.N. would "quickly damage herself financially" if released. Dr. Sidana

10

added that J.C.N. needed institutional care because she presented a danger to her own life or safety or the lives or safety of others. He acknowledged that J.C.N. could "safely care for her own basic needs." Dr. Sidana ultimately concluded that J.C.N. was unable or unwilling to be voluntarily admitted, and there was no less restrictive form of intervention available consistent with her welfare and safety.

J.C.N. next testified. She stated that she had been seeing doctors regularly since her stroke and was not a danger. She testified that, if released, she would have her "own apartment, which is in downtown Baltimore." She also believed that in January she would return to Yale as a seventh-year Ph.D. student and live in New Haven. J.C.N. further testified that she "would love to get out of" the Hospital because she was "very excited" to return to Yale where she would continue working on her dissertation. J.C.N. inconsistently testified that she would "keep a distance from [her] parents," that she would see her parents once a week, and, when told the downtown apartment was not available, that she could live with her parents.

Following the conclusion of testimony, Ms. Bolger and J.C.N.'s counsel presented closing arguments. Counsel for J.C.N. argued a violation of the statutory requirement that the involuntary admission hearing be conducted within ten days of J.C.N.'s initial confinement, which, in counsel's view, was when J.C.N. was taken to the emergency department on November 17. *See* HG § 10-632(b). Regarding whether J.C.N. should be involuntarily admitted to the psychiatric unit of the Hospital, counsel argued that although J.C.N. "may be a danger to her career" and "may be a danger to her finances," the Hospital had failed to demonstrate that she presented a danger to the life or safety of herself or others

11

as required for involuntary admission under HG § 10-632(e).

Following the parties' arguments, the ALJ announced his decision. He first considered J.C.N.'s argument that the hearing was conducted beyond the ten-day period mandated by HG § 10-632(b). The ALJ found that there had been no such procedural violation. He specifically noted the following: J.C.N. required medical treatment before she could be moved to the psychiatric unit; once she was considered medically stable, she was transferred on November 24 to the psychiatric unit; and the involuntary admission hearing was held on December 1, within the required timeframe for conducting such hearings.

The ALJ then turned to whether the Department had established that J.C.N. should be involuntarily admitted. The ALJ found, based on the required standard of clear and convincing evidence and "the record as a whole," that J.C.N. met the requirements for involuntary admission under HG § 10-632. The ALJ credited the certifying physicians' diagnosis of a mental disorder, "Bipolar Disorder type 1" characterized by grandiose delusions. The ALJ also credited Dr. Sidana's testimony, finding, among other facts, that J.C.N. did not have "any insight into [her] mental illness, and that [she] might decide to drive a motor vehicle. That is inadvisable at this time." The ALJ determined that J.C.N.'s "lack of judgment, lack of insight, and these issues about finances as well," demonstrated that she did not have "sufficient judgment" to "maintain [her]self" outside of an institutional setting. The ALJ, directing his remarks to J.C.N., concluded:

> This is an atypical case where there is not one particular incident, or one particular idea of threatening behavior, or being a danger because one is fighting with other individuals, or threatening someone with a weapon, or so

12

forth, but the entire global nature of this case, your lack of insight, and the things that you are indicating that you might do, and I believe it is credible that you might do these things. You are not taking any medication now. Depakote and Risperdal have been prescribed.

So, I conclude that you do present a danger to your own safety and life, and the life of others, particularly if you decide to drive and you are not fit to do so.

The ALJ added that there was no less restrictive form of intervention, and he was not convinced that J.C.N. would be suitable for outpatient treatment because she was not taking medications, was in a manic state, needed treatment, and was suffering from stroke and thyroid storm complications. The ALJ therefore determined that J.C.N. met all criteria for involuntary admission.

*Judicial Review*

Because, as we shall see, we "look through" the judgments of the circuit court and the Court of Special Appeals to review directly the decision of the ALJ, there is no need to summarize the proceedings at either of those levels of judicial review. It is enough to note that J.C.N. filed a timely petition for judicial review in the Circuit Court for Anne Arundel County, raising in that court the claims that she timely presented to the Court of Special Appeals and raises here.

We granted J.C.N.'s petition for writ of certiorari to address several questions, two of which we rephrase as follows:

1. Did the Hospital comply with the ten-day deadline for an involuntary admission hearing?

2. Was there substantial support in the record for the ALJ's finding that J.C.N. presented a danger to the life or safety of herself or of others?

13

We answer "yes" to both questions.[8]

## III.

## Standard of Review

When this Court has before it the decision of an administrative agency, we review directly the agency's decision and not that of the lower courts. *Sturdivant v. Md. Dep't of Health & Mental Hygiene*, 436 Md. 584, 587 (2014). "When this or any appellate court reviews the final decision of an administrative agency . . . , the court looks through the circuit court's and intermediate appellate court's decisions, although applying the same standards of review, and evaluates the decision of the agency." *Kor-Ko Ltd. v. Md. Dep't of the Env't*, 451 Md. 401, 409 (2017) (quoting *People's Counsel for Balt. Cty. v. Surina*, 400 Md. 662, 681 (2007)).

"A court's role in reviewing an administrative agency adjudicatory decision is narrow." *Cosby v. Dep't of Human Res.*, 425 Md. 629, 638 (2012) (quoting *Bd. of Physician Quality Assurance v. Banks*, 354 Md. 59, 67–68 (1999)). It is "limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." *Id.* (quoting *Banks*, 354 Md. at 67–68). In applying the

---

[8] J.C.N. presented a third question: "May an individual challenge an involuntary admission after the individual has been discharged from the hospital, or does mere discharge render the appeal moot?" We granted review of that question but no longer have reason to answer it, as neither Respondent claims that the case is moot. The Hospital conceded at oral argument that the case is not moot because J.C.N. faces collateral consequences attendant to her involuntary admission, and the Department did not argue mootness in its brief before this Court.

substantial evidence test, we decide whether the ALJ's determination was "supported by evidence which a reasonable person could accept as adequately supporting [the] conclusion." *Kenwood Gardens Condos., Inc. v. Whalen Props., LLC*, 449 Md. 313, 325 (2016). We "must review the agency's decision in the light most favorable to it" and recognize that "the agency's decision is prima facie correct and presumed valid." *Critical Area Comm'n for the Chesapeake & Atl. Coastal Bays v. Moreland, LLC*, 418 Md. 111, 123 (2011) (quoting *Md. Aviation Admin. v. Noland*, 386 Md. 556, 571 (2005)). "[I]t is the agency's province to resolve conflicting evidence and to draw inferences from that evidence." *Banks*, 354 Md. at 68 (internal quotation marks omitted).

We further accord deferential review to an administrative agency's interpretation of its statute and regulations. *Adventist Health Care Inc. v. Md. Health Care Comm'n*, 392 Md. 103, 119 (2006). Because the General Assembly has delegated to the Secretary legislative authority to adopt regulations, the Department's regulations have the "force and effect of law." *See State v. Roshchin*, 446 Md. 128, 148 n.20 (2016).

The ALJ's legal conclusions are reviewed *de novo*. *Reger v. Wash. Cty. Bd. of Educ.*, 455 Md. 68, 95 (2017).

### IV.

### The Parties' Contentions

*Petitioner*

J.C.N. argues that the ALJ erred in two respects. She first disputes the ALJ's finding that the hearing on involuntary admission complied with HG § 10-632(b), which requires that the hearing be "conducted within 10 days of the date of the initial confinement of the

15

individual." She maintains that the starting point of the ten-day calculation is the date on which the individual "is confined against her will to any part of a hospital, including the emergency room."

Applying that assertion here, J.C.N. contends that the start of the ten-day period was triggered by her arrival at the Hospital's emergency department on November 17, fourteen days before the involuntary admission hearing. She further contends that this procedural defect erected a jurisdictional bar to proceeding with an involuntary admission hearing, thereby requiring that she be released regardless of the need for psychiatric treatment.

J.C.N. also disputes the ALJ's decision that the Hospital established, by clear and convincing evidence, that she "present[ed] a danger to the life or safety of [herself] or of others" as required for involuntary admission under HG § 10-632(e). J.C.N. contends that, although the statute does not specify the type of harm sufficient to establish danger to life or safety, "[a] statute sanctioning such a drastic curtailment of the rights of citizens must be narrowly, even grudgingly, construed in order to avoid deprivations of liberty without due process of law." *Covington v. Harris*, 419 F.2d 617, 623 (D.C. Cir. 1969).

J.C.N. argues that the evidence suggesting that she made poor professional or financial decisions was speculative and insufficient as a matter of law to establish that she was a danger to the life or safety of herself or others. She further argues that the evidence suggesting that she lacked insight into her diagnosis or refused to take medication does not establish dangerousness absent specific facts regarding how those beliefs or actions posed any imminent physical harm to herself or others. She adds that the evidence merely suggesting that she was under the impression that she could safely drive was too

16

speculative to establish that she was a danger to the life or safety of herself or others.

*Respondents*

Respondents maintain that J.C.N.'s involuntary admission hearing was properly held within ten days of her "initial confinement" in the Hospital's psychiatric unit. They further argue that, even if that were not so, J.C.N. would not be entitled to immediate release. In that regard, Respondents note that the ALJ shall "[o]rder the release of the individual from the inpatient facility" only if the procedural error is "substantial" and there is no other remedy "consistent with due process and the protection of the individual's rights," COMAR 10.21.01.09G(3).

Respondents dispute J.C.N.'s claim that the ten-day period ran from November 17, the day she arrived at the Hospital's emergency department. Respondents point to the statutory and regulatory scheme, which distinguishes between an "emergency facility" and an "appropriate facility" for purposes of involuntary admission. HG §§ 10-620(d)(1), 10-625(a). The former identifies the site of the emergency evaluation; the latter defines the site of inpatient treatment of mental health disorders.

Respondents point out that an "appropriate facility" "may be a general hospital with a licensed inpatient psychiatric unit," HG § 10-625(a), and, unless otherwise provided, is defined as "any public or private clinic, hospital, or other institution that provides or purports to provide treatment or other services for individuals who have mental disorders." HG § 10-101(g)(1). The Department's regulations further clarify that an involuntary admission hearing is held within ten days of confinement to "the *inpatient* facility," COMAR 10.21.01.08A(1)(a) (emphasis added), which is defined as an "inpatient

17

institution that provides evaluation, care, or treatment for individuals who have mental disorders," COMAR 10.21.01.02B(11)(a).

Under this scheme and in this case, Respondents explain, J.C.N. was admitted to the "inpatient facility"—the psychiatric unit of the Hospital—on November 24, 2015, seven days before her involuntary admission hearing. The Department posits that Petitioner's interpretation would create an unreasonably short timeframe for the required steps—including notification of the Office of Administrative Hearings and the Public Defender and coordination of a hearing date, COMAR 10.21.01.08A(1)—to be completed before the hearing is conducted. Both Respondents also contend that, even if there were a delay, the ALJ was not required to release Petitioner because the ten-day hearing deadline is not a jurisdictional requirement.

Respondents next argue that the ALJ's decision was supported by substantial evidence that J.C.N. presented a danger to the life or safety of herself or others if she were to be immediately released from confinement. Respondents contend that there was substantial evidence that J.C.N. was refusing at the time to comply with treatment for her psychiatric and somatic illnesses; had made poor financial and professional decisions; was under the impression that she could safely drive; and was unable to manage her basic needs, which Respondents apparently define differently than Dr. Sidana to include housing, medical treatment, and J.C.N.'s ability to manage her finances. Respondents add that no evidence was offered that family or friends would assist her if she were released.

Respondents note that the ALJ is required to consider "all the evidence and testimony of record." HG § 10-632(e)(1). Respondents emphasize that J.C.N. refused to

18

take her prescribed thyroid and psychiatric medications, which Dr. Sidana characterized as creating "concern" and demonstrating "impaired judgment in managing her thyroid state." Respondents declare that, given all the evidence and the likelihood of harm, particularly to J.C.N., the ALJ properly found "all five criteria for involuntary admission [were] met."

## V.

### Discussion

*The Requirement of an Involuntary Admission Hearing Within Ten Days*

We first address J.C.N.'s contention that her involuntary admission hearing, which took place on December 1, 2015, was untimely because it did not comport with the statutory requirement that the hearing take place "within 10 days of the date of the initial confinement of the individual." HG § 10-632(b). Relying solely upon the text of § 10-632(b), J.C.N. insists that the ten-day period began to run not on November 24, 2015—the date she was transferred to the Hospital's psychiatric unit—but rather on November 17, 2015, the date she was transported to the Hospital's emergency department for an emergency evaluation. She maintains that, as a consequence of violating the statute, the ALJ was stripped of jurisdiction to conduct the hearing, let alone to issue a decision involuntarily admitting her to the Hospital's inpatient psychiatric department. J.C.N. seeks reversal of the ALJ's decision. We disagree with J.C.N.'s view of the statutory framework.

To decide whether J.C.N. received a timely involuntary admission hearing—that is, within ten days of her "initial confinement"—we must first determine the meaning of that phrase as it is used in HG § 10-632(b) and elsewhere in the statute, and as it is clarified in the associated regulations. In undertaking that task, we bear in mind that our goal is to

19

"ascertain and effectuate the intent of the Legislature." *Williams v. Peninsula Reg'l Med. Ctr.*, 440 Md. 573, 580 (2014) (quoting *Kushell v. Dep't of Nat. Res.*, 385 Md. 563, 576 (2005)).  We do that by resort to the standard rules of statutory construction as an aid in interpreting the statutory language.  We explained in our recent *Bell* decision, 2018 WL 3409919, at *10 (internal citations and quotation marks omitted):

> When we construe a statute, we search for legislative intent.  Consideration of the statutory text in context is our primary guide.  We may refer to the statute's legislative history to confirm conclusions or resolve questions from our examination of the text.  Finally, we check our interpretation against the consequences of alternative readings of the text.  Throughout this process, we avoid constructions that are illogical or nonsensical, or that render a statute meaningless.

Particularly useful in the present case is the rule of construction that "the plain language" of the particular statutory text under consideration "must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute."  *Williams*, 440 Md. at 580–81 (quoting *Lockshin v. Semsker*, 412 Md. 257, 275–76 (2010)).

Subsection 10-632(b), located in Part V ("Hearings on Admission") of Subtitle 6, possibly could support J.C.N.'s interpretation when it is read in isolation and given the absence of a statutory definition of "initial confinement."  Yet, one need only look to subsections (a) and (e) of the same section, other sections in Subtitle 6, and the regulations associated with those statutory provisions to understand that "initial confinement" refers to the period of the individual's confinement in an inpatient mental treatment facility pending a hearing at which it is determined whether the individual is to be involuntarily admitted.

We look first to other subsections of § 10-632.  Subsection (a) provides that "[a]ny

20

individual proposed for involuntary admission under Part III of this subtitle shall be afforded a hearing to determine whether the individual is to be admitted to a facility . . . ." Subsection (e) directs that the "hearing officer shall: . . . [o]rder the release of the individual from the facility unless the record demonstrates" the required elements for involuntary admission. As used in those subsections of HG § 10-632 and elsewhere throughout Parts III and IV of Subtitle 6, "facility" is defined as "any public or private clinic, hospital, or other institution that provides or purports to provide treatment or other services for individuals who have mental disorders." HG § 10-101(g). There is no hint in HG § 10-632 that "facility" as used in that section means anything other than an institution intended to provide mental health treatment. We look also to the immediately preceding section of Part V—HG § 10-631. Subsection (b) states that "[w]ithin 12 hours after initial confinement of an individual *to any facility* . . . , the form provided for in this section shall be read and given to the individual." Subsection (d) states in turn that "[t]he facility shall keep in the individual's records a copy of the form and a certification of the administrative head of the facility as to the compliance with this section."

We also consider that the statutory scheme distinguishes between an "emergency facility" on the one hand and an appropriate inpatient "facility" on the other. *See* HG § 10-624(a). At the "emergency facility," the evaluating physician shall "determine whether the emergency evaluee meets the requirements for involuntary admission." HG § 10-624(b)(2). If the evaluee meets those requirements, which are laid out in HG § 10-617(a), then "the examining physician shall take the steps needed for involuntary admission of the emergency evaluee to an appropriate facility, which may be a general

21

hospital with a licensed inpatient psychiatric unit."[9] HG § 10-625(a).

We hold that an emergency evaluee is not subject to "initial confinement" upon arrival in the emergency department, but rather if and when transferred to an "appropriate facility," meaning an "inpatient institution that provides evaluation, care, or treatment for individuals who have mental disorders." COMAR 10.21.01.02B(11)(a). It follows that the ALJ did not err in finding that J.C.N.'s involuntary admission hearing was timely, as it occurred on December 1, seven days after her admission to the Hospital's psychiatric unit on November 24.[10]

*The ALJ's Decision that J.C.N. Be Involuntarily Admitted*

J.C.N. argues that the evidence presented to the ALJ at the involuntary admission hearing did not establish that, at the time of the hearing, she presented a danger to the life or safety of herself or others. We disagree.

The statutory scheme requires the ALJ to "[c]onsider all the evidence and testimony of record" that was offered at the involuntary admission hearing and then order the individual be released "unless the record demonstrates by clear and convincing evidence

---

[9] *See Bell*, 2018 WL 3409919, at *10–11 (noting that although the statute refers to an individual's initial entry into such a facility as an "admission," it is, in reality, the beginning of the next step in the involuntary admission process that triggers the ten-day period during which the individual is in "observation status," which—barring a decision to release the individual in the meantime—will culminate in the involuntary admission hearing).

[10] Because we hold that the ten-day deadline was not violated, we do not address J.C.N.'s additional arguments that (1) the deadline is a jurisdictional requirement and (2) a four-day delay in conducting the hearing (as J.C.N. argues occurred here) would constitute a substantial procedural error warranting release.

that at the time of the hearing" the five applicable elements exist. HG § 10-632(e); *see supra* note 5. The parties do not dispute that four of the five elements of that subsection were met at the time of the hearing: J.C.N. had at that time "a mental disorder," HG § 10-632(e)(2)(i); she "need[ed] in-patient care or treatment," HG § 10-632(e)(2)(ii); she "[was] unable or unwilling to be voluntarily admitted to the facility," HG § 10-632(e)(2)(iv); and there was "no available less restrictive form of intervention that [was] consistent with [her] welfare and safety," HG § 10-632(e)(2)(v). The parties' dispute centers, instead, on the third element of the analysis: whether J.C.N. "present[ed] a danger to the life or safety of the individual or of others." HG § 10-632(e)(2)(iii).

To resolve the dispute, we bear in mind the standard by which we review the ALJ's decision—it must be supported by evidence that "a reasonable person could accept as adequately supporting [the] conclusion." *Kenwood Gardens*, 449 Md. at 325. Application of this standard also requires that we give deference to the ALJ's findings and inferences drawn therefrom. *Moreland, LLC*, 418 Md. at 123.

We look first to the ALJ's findings. The ALJ acknowledged that J.C.N.'s case was "atypical" because it did not involve "one particular incident, or one particular idea of threatening behavior, or being a danger because one is fighting with other individuals, or threatening someone with a weapon, or so forth." Rather, the ALJ's decision was based on "the entire global nature of this case." The ALJ credited the certifying physicians' diagnosis that J.C.N. suffered from a mental disorder, "Bipolar Disorder type 1" characterized by grandiose delusions. The ALJ also expressly credited the expert testimony of Dr. Sidana, a board-certified psychiatrist and one of the two physicians who

23

certified at the outset of the involuntary admission process that J.C.N. had a mental disorder and required inpatient care.

Dr. Sidana outlined in his testimony his basis for diagnosing J.C.N. as suffering from bipolar disorder with grandiose delusions. Those delusions included J.C.N.'s belief that she could return to pursue a Ph.D. at Yale; travel around the country and abroad to give talks at various institutions; purchase and drive an automobile; and function normally without taking the medication prescribed to her. Dr. Sidana further testified, and the ALJ found, that J.C.N.'s stroke left her with partial paralysis on the right side of her body. The ALJ found, as a consequence, that J.C.N. had "problems," which we take to refer to J.C.N.'s inability to use her right arm and hand, control her right foot, and see clearly out of her right eye. Based on those physical limitations, the ALJ further found that it would be "inadvisable at this time" that J.C.N. attempt to drive.

Dr. Sidana also testified that J.C.N. had not been taking two prescribed medications—Risperdal, an antipsychotic medication, and Depakote, a mood stabilizer— to address her manic state. She likewise had not been taking Methimazole, prescribed to address her recent hypothyroid state. Further, in the opinion of Dr. Sidana, J.C.N. "d[id] not believe at all that she [was] manic," which was why she "refused to take her psychiatric medications . . . and thyroid medications that were prescribed to her." Dr. Sidana added that J.C.N. failed to understand that she required follow-up treatment and medication to control her thyroid condition, which, in Dr. Sidana's words, was "very detrimental to her medical health."

Although some of J.C.N.'s delusions, taken alone or in combination with others,

24

might not suggest that at the time of the hearing J.C.N. posed a danger to herself or others, at least one—the delusion that she could function normally without medication and follow-up treatment—did pose a danger. The ALJ, evidently basing his decision on the credited testimony of Dr. Sidana, found that J.C.N.'s "lack of judgment, lack of insight, and these issues about finances as well," demonstrated that she did not have "sufficient judgment" to "maintain [her]self" outside of an institutional setting. Based on that ultimate finding, the ALJ decided that J.C.N. be involuntarily admitted.

The record supports the ALJ's decision. The evidence presented at the involuntary admission hearing, viewed through the prism of the applicable standard of review, *see Kenwood Gardens*, 449 Md. at 325, was such that a reasonable person in the position of the ALJ could accept the evidence as adequately supporting his ultimate finding, by clear and convincing evidence, that at the time of the hearing J.C.N. was a danger to herself or others. That finding satisfied the only disputed element of HG § 10-632(e), which, together with the remaining applicable elements of the subsection, supported the ALJ's decision in favor of involuntary admission. We therefore hold that the ALJ did not err in so deciding and, accordingly, affirm the judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.**